PEOPLE v BENNETT
PEOPLE v BENSON

Docket Nos. 286960 and 287768. Submitted December 9, 2009, at Detroit. Decided November 2, 2010, at 9:10 a.m.

Paula R. Bennett and Kyron D. Benson were convicted of first-degree murder following a joint trial before separate juries in the Wayne Circuit Court, Michael J. Callahan, J. Bennett was convicted on a theory of aiding and abetting Benson to commit the murder. Benson was also convicted of possession of a firearm during the commission of a felony and possession of a firearm by a felon. Both were sentenced to life in prison for the murder conviction, and Benson was also sentenced to two years in prison for the felony-firearm conviction and one to five years in prison for the felon-in-possession conviction. Bennett (Docket No. 286960) and Benson (Docket No. 287768) appealed separately. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The elements of first-degree murder are the intentional killing of a human with premeditation and deliberation. A defendant may be vicariously liable for murder on a theory of aiding and abetting. The elements of aiding and abetting are (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. An aider and abetter's knowledge of the principal's intent can be inferred from the facts and circumstances surrounding an event.

2. There was considerable evidence from which the jury could have inferred that Bennett knew of Benson's intent to kill the victim at the time that Bennett gave Benson directions to where the victim lived. The evidence belied Bennett's argument on appeal that she did not want Benson to kill the victim. The evidence did not negate the critical element of Bennett's knowledge of Benson's specific intent to kill the victim. Sufficient

evidence supported the conclusion of the jury that Bennett was guilty of first-degree murder on a theory of aiding and abetting.

3. The prosecutor did not give the jury the impression that she had special knowledge regarding the innocence of the suspects that the police had questioned before they focused on defendants by failing to elicit details regarding the alibis or other exonerating details pertaining to those prior suspects. Because the truth or falsity of the prior suspects' alibis was not directly relevant to defendants' guilt, the failure to pursue the question did not raise an inference of special knowledge regarding the innocence of the prior suspects. Nor did the prosecutor vouch for the credibility of the investigator.

4. There was legally sufficient evidence for a person of ordinary caution and prudence to have a reasonable belief that Benson committed the crime of murdering the victim. The presentation of sufficient evidence to convict at trial rendered any alleged erroneous bindover decision harmless.

5. A statement made to an acquaintance outside a formal proceeding, with no indication that it was made for the purposes of identifying the perpetrator of a crime, is a nontestimonial statement that does not implicate the Confrontation Clause. The statement may be admitted as substantive evidence at trial pursuant to MRE 804(b)(3).

6. A statement that is a command rather than an assertion is not hearsay under MRE 801.

Affirmed.

SHAPIRO, J., concurring in part and dissenting in part, concurred in the affirmance of the first-degree-murder conviction of Benson, but dissented from the affirmance of Bennett's conviction on the basis that no evidence supported the conclusion that Bennett wanted the victim to be harmed, let alone killed. In addition, the nature of the criminal jury instruction on aiding and abetting that was given by the trial court failed to have the jury consider whether Bennett subjectively knew, i.e., believed, that Benson intended to kill at the time Bennett provided assistance to Benson. The jury instruction instead asked the jury to make a determination based on an objective test, i.e., whether a reasonable person would or should have known of Benson's intent. Therefore, because it could not be determined whether the jury found that Bennett had the necessary subjective intent, Bennett's conviction should be reversed and the matter should be remanded for a new trial. Moreover, if reversal were not required on this basis, the matter should be remanded for a hearing pursuant to *People v*

*Ginther*, 390 Mich 436 (1973), to consider whether Bennett received effective assistance of trial counsel. There was a substantial likelihood that Bennett was convicted on the basis of a finding that she was grossly negligent in failing to recognize that Benson intended to commit a murder at the time she provided assistance to him. In the context of the unusual facts of this case, the criminal jury instruction created a standard that allowed for conviction of first-degree murder, not on the basis of an intent, but on the basis of gross negligence. The failure of Bennett's counsel to request a modification of the jury instruction fell below an objective standard of reasonableness under prevailing professional norms, and there was a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. The jury should have been instructed that Bennett's actions must have been taken with the actual knowledge that the assistance the actions provided would be used to accomplish a murder or some criminal plan that the murder of the victim was fairly within. Various other alleged errors by Bennett's trial counsel also required a remand for a *Ginther* hearing. Judge SHAPIRO stated that the Legislature should consider amending MCL 767.39 and MCL 750.316 so as to modify the statutory punishment for aiding and abetting first-degree murder, given the wide range of culpability within the scope of the broad definition of aiding and abetting.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Kym L. Worthy*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Jason W. Williams*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gail Rodwan*) for Paula R. Bennett.

*Burkett & Associates, Inc.* (by *Raymond R. Burkett*), for Kyron D. Benson.

Before: METER, P.J., and BORRELLO and SHAPIRO, JJ.

BORRELLO, J. In these consolidated appeals, both defendants appeal their convictions arising out of the shooting death of Stephanie McClure in 2007.

In Docket No. 286960, defendant, Paula Renai Bennett, appeals as of right her conviction by a jury of first-degree murder, MCL 750.316. Bennett was sentenced to life in prison. For the reasons set forth in this opinion, we affirm.

In Docket No. 287768, defendant, Kyron Darell Benson, appeals as of right his convictions by a jury of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, possession of a firearm by a felon, MCL 750.224f, and first-degree murder, MCL 750.316. Benson was sentenced to two years in prison for the felony-firearm conviction, one to five years in prison for the felon-in-possession conviction, and life in prison for the first-degree-murder conviction. For the reasons set forth in this opinion, we affirm.[1]

## I. FACTS

Defendants lived together in Bennett's apartment. The victim, Stephanie McClure, was Bennett's friend and sometimes stayed at Bennett's apartment. In October 2007, defendants discovered that several items, including a PlayStation 2, clothes, and shoes, had been stolen from Bennett's apartment. Benson became angry over the stolen items and began to blame McClure for stealing them. Benson started making threatening comments to several people about McClure, including commenting that he wanted to kill McClure for stealing the items. Benson told one of the persons to whom he had indicated that he wanted to kill McClure, Breanna Kandler, one of Bennett's friends, that he would kill

---

[1] Defendants were tried together before separate juries. This Court consolidated the appeals in the interest of the "efficient administration of the appellate process." *People v Bennett*, unpublished order of the Court of Appeals, entered July 23, 2009 (Docket Nos. 286960 and 287768).

Kandler too if she "[said] anything" about his threats. Benson wanted Kandler to drive him to McClure's trailer to get the apartment key back from McClure. Kandler testified that she took Benson's threats seriously and, accordingly, refused to take Benson to McClure's trailer.

Later in the evening, defendants and several of their friends were at Bennett's apartment. They noticed that defendants' puppy was missing and were looking around the apartment for the dog. Benson joked that maybe the dog was in the freezer, and when he checked in the freezer, he did indeed find the puppy, which was dead. Benson immediately accused McClure of killing the dog as well. Two of Bennett's friends testified that they thought Benson had killed the dog because of the way he reacted to finding it. After the dead dog was disposed of, defendants and their friends went to a Dairy Mart. While at the Dairy Mart, Kandler saw Benson take a gun out of his car and put it in his pants. Another friend, Jessica Fritz, testified that she had previously seen her boyfriend sell a gun to Benson. Later that evening, Bennett and Benson left their friends, stating that they were going to "get [their] stuff back."

Benson then called his friend Michael Larvaidan and asked him to meet defendants at a Kroger store. Larvaidan had spoken to Benson about the stolen items several times in the preceding days. He testified that he tried to get Benson to calm down about the incident. According to Larvaidan, while at Kroger, Benson was angry and "going on about trying to get his stuff back, . . . talking about going to kill [McClure]." Benson showed Larvaidan a gun while he was talking about this. After Larvaidan got into the car with defendants, Bennett directed Benson to go to "Holiday West," the

trailer park where McClure lived. Benson drove according to Bennett's directions. Once they reached the trailer park, Bennett specifically directed Benson to McClure's trailer. They saw McClure standing outside by the trailer, in front of a car. Benson said, "That's her."

Larvaidan testified that he told Benson, "[D]rive off." Benson drove around the trailer park and then parked the car. Larvaidan told him "just to talk to her. Don't do nothing stupid." Benson got out of the car and walked toward McClure's trailer. Bennett moved to the driver's seat, and she and Larvaidan continued to drive around the trailer park. While they were driving around, Larvaidan saw Benson talking to McClure. After several minutes they heard three or four gunshots and then saw Benson running away. Bennett started crying as soon as they heard the gunshots. Bennett drove toward where Benson was running, and Benson got back in the car. Larvaidan asked Benson, "Why?" Benson responded that "he would have lost respect in the . . . hood." Larvaidan also said, "[You] better hope she's dead . . . 'cause if she's not, [you're] going to jail."

Because Bennett was charged with murder on a theory of aiding and abetting Benson, several witnesses testified regarding the interactions between defendants and Bennett's conduct toward Benson. The evidence presented demonstrated that Bennett was present when Benson started making threats about killing McClure, as well as threats toward Kandler. Benson was also yelling at Bennett at this time, telling her that she "was dumb for giving [McClure] a key." Kandler testified before Bennett's jury only that Bennett told her that she thought Benson "looked pretty serious" about killing McClure, although Kandler testified that she never witnessed Bennett agree to kill McClure.

Fritz testified that she heard defendants arguing for an extended period before they went to McClure's trailer; Benson was again yelling at Bennett because she had given a key to McClure. Bennett told Benson that she had filed a report with the police and that the police would take care of it. Fritz could not recall Benson's response to Bennett. After the argument, Bennett told Fritz that she and Benson were "leaving to get their stuff back."

Finally, Larvaidan testified that Benson was talking openly in the car about shooting McClure just before Bennett gave Benson directions to McClure's trailer. Bennett did not respond to these comments. Larvaidan also testified that after they heard gunshots, Bennett immediately began crying and drove back around toward McClure's trailer, where they observed Benson running away.

Following numerous seemingly erroneous leads, the police eventually arrested defendants for the murder of Stephanie McClure. After defendants were arrested, Benson was observed telling Bennett under the door between their jail cells, "Don't talk."[2] Following trial, defendants were found guilty on all counts and sentenced as previously stated. These appeals ensued.

II. DOCKET NO. 286960: *PEOPLE v BENNETT*

Bennett's first argument on appeal is that there was insufficient evidence to prove that she aided and abetted Benson in the commission of first-degree murder.

This Court reviews de novo claims of insufficient evidence, viewing the evidence in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the

---

[2] This evidence was presented to Benson's jury only.

crime were proved beyond a reasonable doubt. *People v Tombs*, 472 Mich 446, 459; 697 NW2d 494 (2005) (opinion by KELLY, J.). Further, this Court must defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses. *People v Fletcher*, 260 Mich App 531, 561; 679 NW2d 127 (2004). "[C]onflicts in the evidence must be resolved in favor of the prosecution." *Id.* at 562. Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999).

The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation. *People v Taylor*, 275 Mich App 177, 179; 737 NW2d 790 (2007); MCL 750.316(1)(a). A defendant may be vicariously liable for murder on a theory of aiding and abetting. *People v Usher*, 196 Mich App 228, 232-233; 492 NW2d 786 (1992), overruled in part on other grounds by *People v Perry*, 460 Mich 55, 64-65 (1999). The elements of aiding and abetting are

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citations omitted).]

See also MCL 767.39. Bennett asserts that the prosecution did not prove the third element of aiding and abetting—that Bennett *knew* Benson intended to kill the victim at the time she directed him to where the victim lived.

There was evidence presented to the jury that demonstrated Bennett's desire to let the police resolve the

issue of the victim's alleged theft of items from Bennett and Benson. Testimony elicited at trial clearly indicated that Bennett went to the police station to report the theft. Fritz testified that Bennett and Benson fought about the theft and that Benson blamed Bennett for giving the victim a key to their apartment. When Bennett and Benson left to go to the victim's trailer, Bennett told Fritz only that they were going to retrieve the stolen items. Nobody heard Bennett agree to help Benson kill the victim. Fritz testified that Bennett told Benson at one point while he was making his threats, "No, I can't do it." Finally, Bennett acted shocked and upset after the victim was shot.

There was also evidence presented at trial from three witnesses who testified that during the day preceding the murder, Benson threatened, in Bennett's presence, to kill the victim. Kandler testified that she took Benson's threats seriously enough to refuse to drive Benson to see the victim. Kandler also testified that Bennett told her that Benson seemed serious when he was making his threats. After Bennett's statement to Fritz about retrieving the stolen items, Benson repeated his threat in Bennett's presence, and Bennett saw Benson show a gun to Larvaidan just before the murder. Bennett agreed to direct Benson directly to the victim's trailer even after Bennett saw Benson with the gun and heard his threats to kill McClure and even though she took the threats seriously. Larvaidan also testified that Benson talked openly in the car about shooting the victim just before Bennett gave Benson directions to the victim's trailer. Testimony further indicated that after Bennett had directed Benson to the victim's trailer and Benson had got out of the vehicle after positively identifying the victim, Bennett then assumed the wheel of the car, drove around the trailer park, and drove the

car back around toward the victim's trailer after she and Larvaidan heard shots and observed Benson running away.

Pursuant to *Robinson*, 475 Mich at 6, in order for the prosecution to prevail on the element of aiding and abetting raised in Bennett's appeal, the prosecution must prove that the defendant either intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. To the extent that Bennett directs this Court to conflicts in the testimony, we note that it is the jury's role to weigh the evidence and resolve any conflicts. *Fletcher*, 260 Mich App at 561-562. An aider and abetter's knowledge of the principal's intent can be inferred from the facts and circumstances surrounding an event. *People v Turner*, 213 Mich App 558, 568; 540 NW2d 728 (1995), disapproved in part on other grounds in *People v Mass*, 464 Mich 615, 628 (2001). Despite Bennett's directing this Court's attention to some evidence that suggests that it was not Bennett's desire to kill the victim, there was considerable evidence from which the jury could have inferred that Bennett knew of Benson's intent. She observed and heard Benson make multiple and serious threats to kill the victim. She saw him with a gun immediately before directing him to the location of the shooting and driving there with him. Consequently, the evidence presented at trial belies Bennett's argument on appeal that she did not want Benson to kill the victim. However, even if we concluded that the evidence established that Bennett may have been reluctant to have Benson kill the victim, that evidence does not negate the critical element of Bennett's knowledge of Benson's specific intent to kill the victim. The evidence proffered by Bennett on appeal merely demonstrates that Bennett may have been unenthusiastic about the

prospect of Benson's killing the victim. Such evidence does not negate the fact that Bennett was aware of Benson's specific intent to kill the victim. Thus, we find that there was sufficient evidence from which the jury could conclude that Bennett was guilty of first-degree murder on a theory of aiding and abetting.

Bennett next argues that the prosecutor committed misconduct by failing to adequately plumb the depths of the investigation by the officer in charge into prior suspects in the case. Bennett also argues that the prosecutor bolstered the officer's testimony in her closing argument.

In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Bennett's trial counsel objected to the prosecutor's questioning in one instance, with respect to whether the officer's investigation changed his recommendation of whom to charge in this case. Thus, with respect to this alleged error, this issue was preserved. Bennett's trial counsel did not raise any other objections concerning this issue; therefore, the issue was not preserved with respect to other alleged errors.

Issues of prosecutorial misconduct are reviewed de novo to determine whether the defendant was denied a fair and impartial trial. *People v Akins*, 259 Mich App 545, 562; 675 NW2d 863 (2003). Further, allegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context. *Id.*

Unpreserved issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or

seriously affected the fairness, integrity, or public repu-
tation of judicial proceedings." *People v Callon*, 256
Mich App 312, 329; 662 NW2d 501 (2003). "Further,
[this Court] cannot find error requiring reversal where
a curative instruction could have alleviated any preju-
dicial effect." *Id.* at 329-330.

Bennett argues that the prosecutor "vouched [for] or
bolstered" Officer John Toth's testimony by eliciting
answers from him about the nature of his investigation
and the exoneration of prior suspects. Bennett argues
that the prosecutor asked Toth whether his investiga-
tion eliminated possible suspects other than defendants
but did not provide corroborating evidence to support
Toth's conclusions. Bennett cites *United States v Fran-
cis*, 170 F3d 546, 551 (CA 6, 1999), which stated, in
relevant part:

> A prosecutor may ask a government agent or other
> witnesses whether he was able to corroborate what he
> learned in the course of a criminal investigation. However,
> if the prosecutor pursues this line of questioning, she must
> also draw out testimony explaining how the information
> was corroborated and where it originated.

The *Francis* court also discussed the rationale underly-
ing this discussion: "The prosecutor's failure to intro-
duce to the jury whether the information was corrobo-
rated via documents, searches, conversations, or other
means, would lead a reasonable juror to believe that the
prosecutor was implying a guarantee of truthfulness
based on facts outside the record." *Id.*

This underlying rationale is echoed in Michigan
caselaw: "Included in the list of improper prosecutorial
commentary or questioning is the maxim that the
prosecutor cannot vouch for the credibility of his wit-
nesses to the effect that he has some special knowledge
concerning a witness' truthfulness." *People v Bahoda*,

448 Mich 261, 276; 531 NW2d 659 (1995). The danger is that the jury will be persuaded by the implication that the prosecutor has knowledge that the jury does not and decide the case on this basis rather than on the evidence presented. *Id.*; *People v Matuszak*, 263 Mich App 42, 54-55; 687 NW2d 342 (2004).

In this case, the prosecutor took Toth through a lengthy discussion of his investigation of multiple suspects and drew out the chain of interviews and the investigation that led to suspicion of defendants. The questioning about which Bennett complains relates to the exoneration of the prior suspects. Bennett argues that the prosecutor left the jury with the impression that the prosecutor had special knowledge regarding the innocence of the prior suspects by failing to elicit details regarding their alibis or other exonerating details.

Bennett's entire argument relies on an analogy to the *Francis* case. However, the facts presented in this case differ substantially from the circumstances in *Francis*. In *Francis*, the officer was testifying about statements he received from a witness about the defendant. *Francis*, 170 F3d at 551. He testified that he corroborated the statements without indicating how he had done so. *Id.* In this case, the testimony Bennett questions pertained merely to the exoneration of other suspects, none of whom were on trial or witnesses against defendants in this case. The credibility of other suspects' alibis was not directly relevant to defendants' guilt or innocence. The purpose of the prosecutor's line of questioning did not pertain to evidence regarding the guilt or innocence of defendants, but merely provided a context for the jury of the officer's investigation and how it eventually led to defendants. Further, the prosecution is not required to disprove everyone else's guilt; rather, the prosecution is only required to present evidence of the

defendant's guilt. Because the truth or falsity of the prior suspects' alibis was not directly relevant to defendants' guilt, the failure to pursue the question did not raise an inference of special knowledge regarding the truth of Toth's testimony. *Bahoda*, 448 Mich at 276.

Bennett also argues that the prosecutor improperly bolstered Toth's testimony in her closing argument. A prosecutor may not vouch for the credibility of his or her witnesses. *People v Schutte*, 240 Mich App 713, 722; 613 NW2d 370 (2000), overruled in part on other grounds by *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004). However, a prosecutor may comment on his or her own witnesses' credibility, especially when credibility is at issue. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004); *Schutte*, 240 Mich App at 721-722. The prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility. *Schutte*, 240 Mich App at 721. The prosecutor must refrain from commenting on his or her "personal knowledge or belief regarding the truthfulness of the . . . witnesses," *Thomas*, 260 Mich App at 455, or "convey[ing] a message to the jury that the prosecutor had some special knowledge or facts indicating the witness' truthfulness," *Bahoda*, 448 Mich at 277.

The prosecutor argued that the jury should focus on the evidence against defendants rather than consider the possibilities raised by defense counsel that someone else could have committed the crime and that the police did not adequately rule out other suspects. She stated, "[F]rankly, Martians from outer space might have done it, too. But that's not what happened. That's not what the evidence shows." Additionally, the prosecutor argued that the police conducted a proper investigation by not jumping to conclusions about possible suspects.

We cannot identify in the prosecutor's closing argument any intimation that she had special knowledge regarding Toth's investigation or that she put a "stamp of approval" on the testimony. She merely summarized Toth's testimony that the police investigated several leads before identifying defendants as suspects to rebut the suggestion that the police haphazardly identified defendants. She made no comments about the substance of Toth's investigation. The closest she came to putting her "stamp of approval" on the testimony was by stating that the officers did the investigation "to the best of their ability" and that Toth "did what an officer should do and try to get to the truth." These statements were innocuous and unspecific, again simply rebutting the suggestion that the officers did not do an adequate investigation. Further, the statements developed an argument based on the evidence and the reasonable inferences arising from the evidence. *Schutte*, 240 Mich App at 721. Finally, the prosecutor did not claim to know anything about the investigation beyond what was shown by the evidence—that the police investigated multiple leads before focusing on defendants. *Bahoda*, 448 Mich at 277. The prosecutor's remarks were proper.

We affirm the conviction and sentence of defendant Paula Renai Bennett.

### III. DOCKET NO. 287768: *PEOPLE v BENSON*

Benson initially argues that the trial court erred when it denied his motion to quash the district court's bindover decision. "A circuit court's decision to grant or deny a motion to quash charges is reviewed de novo to determine if the district court abused its discretion in binding over a defendant for trial." *People v Jenkins*, 244 Mich App 1, 14; 624 NW2d 457 (2000). Questions of

constitutional law are reviewed de novo. *People v Davis*, 472 Mich 156, 159; 695 NW2d 45 (2005).

At the preliminary examination, Fritz and Kandler testified against both defendants. Fritz testified that Bennett told her after the murder that Benson "did it." This testimony was admitted only against Bennett.[3] Benson argues that, absent this testimony, the prosecution failed to produce sufficient evidence to bind him over on the charges at his preliminary examination.

"The purpose of a preliminary examination is to determine whether probable cause exists to believe that a crime was committed and that the defendant committed it." *People v Lowery*, 274 Mich App 684, 685; 736 NW2d 586 (2007). Accordingly, the prosecutor need not demonstrate guilt beyond a reasonable doubt at the preliminary-examination stage. *Id.* Probable cause is established if "a person of ordinary caution and prudence [could] conscientiously entertain a reasonable belief of the defendant's guilt." *Id.* (quotation marks and citation omitted).

At the preliminary examination, Fritz testified that Benson was angry at the victim for stealing the items and he threatened to kill the victim. Fritz testified that she witnessed Benson and Bennett leave together to find the victim just before the killing. She testified that Bennett returned from that trip and looked upset. Kandler also testified that she had heard Benson threatening to kill the victim earlier in the day before she was killed. Thus, multiple witnesses heard Benson threaten to kill the victim, Benson was observed leaving to look for the victim just before her death, and Bennett returned from the trip crying and upset. Benson argues that the district court must necessarily have considered

_____

[3] At trial, the testimony was admitted against Benson as an excited utterance.

Fritz's further testimony that Bennett told her that Benson killed the victim because this other evidence was insufficient to establish probable cause. However, we conclude that even without Bennett's statements, there was legally sufficient evidence for a "person of ordinary caution and prudence" to have a reasonable belief that Benson committed the crime of murdering the victim. Moreover, the presentation of sufficient evidence to convict at trial renders any erroneous bindover decision harmless. *People v Libbett*, 251 Mich App 353, 357; 650 NW2d 407 (2002).

Benson next argues that the trial court erred when it admitted on several occasions testimonial hearsay that violated his right of confrontation. Benson raised these issues in a motion for a new trial and argues on appeal that the trial court should have granted a new trial. The decision whether to grant a new trial is within the trial court's discretion and is, therefore, reviewed for an abuse of discretion. *People v Brown*, 279 Mich App 116, 144; 755 NW2d 664 (2008); *People v Lester*, 232 Mich App 262, 271; 591 NW2d 267 (1998). Questions of constitutional law are reviewed de novo. *Davis*, 472 Mich at 159.

"The Confrontation Clause of the Sixth Amendment bars the admission of 'testimonial' statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *People v Walker (On Remand)*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006). In *People v Taylor*, 482 Mich 368, 378-379; 759 NW2d 361 (2008), our Supreme Court held with regard to whether a statement is testimonial:

> The overruling of [*Ohio v Roberts*, 448 US 56; 100 S Ct 2531; 65 L Ed 2d 597 (1980)] by the United States Supreme Court in *Crawford* and *Davis* [*v Washington*, 547 US 813;

126 S Ct 2266; 165 L Ed 2d 224 (2006)] undermines the analytical underpinnings of this Court's decision in [*People v Poole*, 444 Mich 151; 506 NW2d 505 (1993)], which was entirely predicated on *Roberts*. Thus, the holding in *Poole* that a codefendant's nontestimonial statement is governed by *both* MRE 804(b)(3) and the Confrontation Clause is no longer good law.... Accordingly, the admissibility of the statements in this case is governed solely by MRE 804(b)(3). This Court's MRE 804(b)(3) analysis in *Poole* remains valid, however, and provides the applicable standard for determining the admissibility of a codefendant's statement under the hearsay exception for statements against a declarant's penal interest. MRE 804(b)(3) provides:

"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

"(3) *Statement against interest*. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

In *Poole* [444 Mich at 161], this Court held:

"[W]here, as here, the declarant's inculpation of an accomplice is made in the context of a narrative of events, at the declarant's initiative without any prompting or inquiry, that as a whole is clearly against the declarant's penal interest and as such is reliable, the whole statement—including portions that inculpate another—is admissible as substantive evidence at trial pursuant to MRE 804(b)(3)."

Thus, our Supreme Court has ruled that a statement made to an acquaintance, outside a formal proceeding, is a nontestimonial statement and may be admitted as substantive evidence at trial pursuant to MRE 804(b)(3). *Taylor*, 482 Mich at 378-379. Benson argues that Fritz's testimony that Bennett told her that Benson killed the victim violated his right of confrontation. Bennett's statements were made to Fritz, a friend, and not within a formal proceeding. Thus, they were nontestimonial and do not implicate the Confrontation Clause. *Id.* Benson next argues that Kandler's testimony that Bennett told her cousin that Benson was threatening to kill the victim was a Confrontation Clause violation. Because this statement was to an acquaintance and there is no indication that it was made for the purposes of identifying the perpetrator of a crime, the statement was nontestimonial and did not implicate the Confrontation Clause. *Id.* at 378; *Walker*, 273 Mich App at 63.

Benson next argues that Larvaidan's testimony about a conversation he had with his father about whether to talk to the police violated his right of confrontation. Larvaidan's father told Larvaidan to "tell the truth." This statement was not hearsay because it did not contain an assertion; it was a command. MRE 801; *People v Jones (On Rehearing After Remand)*, 228 Mich App 191, 204-205; 579 NW2d 82 (1998), mod 458 Mich 862 (1998). Moreover, the statement was nontestimonial because it had nothing to do with Benson or his alleged conduct and it was not made for testimonial purposes. *Taylor*, 482 Mich at 378; *Walker*, 273 Mich App at 63.

Finally, Benson argues that Kathleen McIntyre's testimony that her mother told her "to leave the room" while she spoke to Bennett on the phone also violated

his right of confrontation. Like Larvaidan's testimony, this statement was not even an assertion, let alone testimonial. *Taylor*, 482 Mich at 378; *Walker*, 273 Mich App at 63; *Jones*, 228 Mich App at 204-205.

Benson also argues that the prosecutor committed misconduct by referring in her opening statement to Fritz's testimony regarding Bennett's statements. However, because the statements were in fact admitted, and we have concluded that they were properly admitted, the prosecutor did not err. *People v King*, 215 Mich App 301, 307; 544 NW2d 765 (1996).

Benson finally makes the same argument as Bennett that the prosecutor improperly vouched for and bolstered Toth's testimony through her questioning and closing remarks. We have already concluded that the questioning of Toth did not constitute misconduct. Further, the prosecutor's argument to Benson's jury was largely the same as her argument to Bennett's jury, and we conclude that she was not bolstering Toth's testimony or intimating to the jury that she had special knowledge regarding Toth's investigations.[4]

We affirm the convictions and sentences of defendant Kyron Darell Benson.

Affirmed.

---

[4] Benson also raises in his statement of questions presented the argument that Fritz's testimony was inadmissible hearsay erroneously admitted. Benson waived this argument because he failed to provide any support for the contention. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . ." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Benson also argued that the same testimony was a violation of the Confrontation Clause, but neglected to present the issue in his statement of questions presented. Thus, this argument is also waived. *English v Blue Cross Blue Sheild of Mich*, 263 Mich App 449, 459; 688 NW2d 523 (2004).

METER, P.J., concurred.

SHAPIRO, J. (*concurring in part and dissenting in part*). I concur in the majority's affirmance of the convictions of defendant Kyron Benson in Docket No. 287768. I do not believe that any of the issues raised by Benson have merit and, further, the evidence against him for the murder of the victim was overwhelming.

It is in part because of the overwhelming evidence against Benson that I must dissent from the affirmance of defendant Paula Bennett's conviction in Docket No. 286960. Bennett was convicted of aiding and abetting a first-degree murder that was committed by her boyfriend, Benson, because she told him where the victim lived and helped direct him there. However, I find no evidence in the record to support a conclusion that Bennett wanted the victim to be harmed, let alone killed. Further, I conclude that the nature of the criminal jury instruction on aiding and abetting failed to have the jury consider the fundamental issue in this case, i.e., whether Bennett subjectively knew, i.e., believed, that Benson intended to kill at the time she provided assistance. Rather, the instruction asked the jury to make a determination based on an objective test, i.e., whether a reasonable person would or should have known of Benson's intent. Therefore, I do not believe that we can determine whether the jury found that Bennett had the necessary subjective intent, and so I would reverse the conviction and remand for a new trial. I further conclude that if reversal were not required on this basis, the case would still have to be remanded for a *Ginther*[1] hearing.

Finally, while it may be of little consequence to this defendant, I believe that the Legislature should con-

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

sider amending MCL 767.39 and MCL 750.316 to
modify the statutory punishment for aiding and abet-
ting first-degree murder. Given the wide range of cul-
pability within the scope of the broad definition of
aiding and abetting, I believe that sentencing judges
should have the discretion to sentence an aider and
abettor of first-degree murder to any term of years, life
with parole, or life without parole.

### I. FACTS RELATING TO THE INTENT AND KNOWLEDGE OF BENNETT

The victim, Stephanie McClure, had stayed for sev-
eral days at the apartment shared by Benson and
Bennett. When McClure left their apartment, she alleg-
edly stole several items.[2] Bennett reported the theft to
the police. She repeatedly stated that she simply wanted
her things back and did not want any harm to come to
McClure, whom she had known for many years and
considered a friend.

There is no evidence that Bennett wanted Benson to
harm, let alone shoot, McClure. Although Benson made
many threats against McClure, there is no evidence that
Bennett joined in the threats or approved of them. To the
contrary, the evidence demonstrates that Bennett repeat-
edly disagreed with Benson when he made these threats
and that when he made them, she "cried and freaked out,"
"[a]nd she didn't want him to do it." Indeed, at one point
when Benson insisted that Bennett help him carry out his
threats, Bennett stated: "No, I can't do it. I'm not like
you." According to a witness to this interaction, Bennett
was crying and "made it very clear to him that she
thought it was over because she had went and made a
police report. But he just kept yelling."

---

[2] Although the record does not contain evidence that the victim
committed theft, it was not disputed by the prosecution.

Bennett's response to the theft was to take the appropriate and lawful action, i.e., going to the police to report the theft. It is difficult to understand why Bennett would identify herself to the police and link herself to accusations against McClure if her intent was to kill McClure or if she believed or expected that her boyfriend was going to kill McClure.

In addition, Benson's threats waxed and waned, and sometimes he indicated his agreement with Bennett that they should just get their things back from McClure and that could be the end of the dispute. Consistent with that fact, the uncontradicted testimony of Jessica Fritz was that when Bennett and Benson left their apartment to go to McClure's home, "Paula came out to tell me that they were leaving to go get their stuff back from [McClure] and her house keys that [McClure] had." Bennett's behavior following the shooting was consistent with her statement that her expectation was that they were going to get their things back and that she did not expect violence. Although Bennett did not see Benson shoot McClure, she heard the shots. Her reaction was to immediately begin to cry. Upon arriving at her apartment shortly thereafter, Bennett displayed shock and distress. A witness testified: "I woke up to her slamming and opening the door, opening the door real wide. Her eyes were real big. Her hands were shaking like this and she's crying."

Four witnesses other than Bennett heard Benson's threats against the victim. Three of them testified that they did not believe that Benson would carry them out. Further, none of them took any action to prevent the killing because they did not believe Benson would actually carry out his threats. Fritz testified that she heard threats by Benson. She testified that she did not like Benson

"because of the things he did to [Bennett]."[3] Fritz testi-
fied that she heard Benson make several threats to kill
the victim, but that she did not believe he actually
intended to because, "I didn't think he was stupid
enough to shoot somebody." She further testified that
when Bennett told her that Benson had shot the victim,
"I didn't believe her at all. My mind was, I was in shock
basically. . . . I thought she was lying."

Most significant in this regard was the testimony of
Michael Larvaidan. Larvaidan knew Benson and rode
with him and Bennett to the trailer park in which
McClure lived. He testified that, during the drive,
Benson did threaten to kill McClure, but he did not
believe that Benson would actually do so. The question
was put to him directly during his testimony:

> *Q.* Did you really expect that he was going to kill
> anybody?
>
> *A.* No.

In addition, Larvaidan testified that he had spoken
with Benson two or three times by phone earlier in the
day and that while Benson had seemed upset about the
theft, he stated only that he was going to get his stuff from
McClure and made no threats against her. Indeed, Ben-
son's action in stopping on the way to McClure's trailer to
pick up Larvaidan and bring him along for the ride would
not appear, to an observer, to be consistent with an intent
to commit a murder. Larvaidan testified that he sat in the
front passenger seat next to Benson, that during the
10-minute drive he told Benson to cool down and not do
anything stupid, and that he had previously calmed Ben-
son down in situations when Benson was angry. He

---

[3] At the preliminary examination, Fritz testified that she had previ-
ously witnessed Benson beating Bennett.

testified that after he told Benson to calm down, Benson did not repeat the threat to shoot McClure.

One witness, Breanna Kandler, testified that she believed Benson's threats were serious. Kandler went with Bennett to the police department to report the alleged theft by McClure. She testified that after making the police report, she and Bennett picked up Benson, who had known of the alleged theft before Bennett made the police report. She testified that during the drive, Benson was threatening to kill McClure, during which, as already noted, Bennett was "crying and freaking out." She testified that Bennett "was scared. And she didn't want him to do it."

Kathleen McIntyre, another witness, thought Bennett had "made it very clear to [Benson] that she thought it was over because [Bennett] had went and made a police report. But [Benson] just kept yelling" despite the fact that Bennett told him several times that she had made a police report and that was all they should do. According to McIntyre, Benson alternated during this conversation between threatening to kill McClure and saying that all he wanted to do was get his stuff back from her. Fritz corroborated this with her testimony that in her statement to the prosecutor's office she stated that Benson "was talking about people walking all over [Bennett]" and that Bennett indicated that she wanted to let the police handle it.

The prosecution never argued that the evidence supported a finding that Bennett wanted Benson to shoot the victim or, indeed, harm her in any way. Further, the evidence overwhelmingly supports a determination that Bennett's purpose in going to the trailer park was to get her belongings back from McClure, that she did not want McClure hurt, and that although Benson had made remarks regarding wanting to kill

McClure, Bennett did not believe that Benson intended to shoot McClure and, like Larvaidan who was also in the vehicle, was shocked that Benson had done so. The uncontradicted evidence clearly supports the conclusion that Bennett did not share Benson's intent to harm, shoot, or kill McClure and that she did not intend to aid Benson in committing murder by directing him to the trailer park. Rather, the evidence supports the view that Bennett believed that she was directing Benson to McClure's residence in the hopes of reacquiring the belongings McClure had allegedly stolen from her. Bennett's reactions to the murder displayed shock and distress, not satisfaction. The other person in the car at the time of the shooting did not believe that Benson was going to shoot McClure, and three others who heard the threats did not consider them credible. The only one who did believe the threats to be credible testified that Bennett was frightened by Benson and that Bennett did not want McClure harmed.

## II. AIDING-AND-ABETTING INSTRUCTION

The trial judge gave CJI2d 8.1, the criminal jury instruction on aiding and abetting. As a general rule, this instruction properly sets forth the required proofs for an aiding-and-abetting conviction. However, the instruction does not clearly address the very specific question of intent raised in this case. Therefore, I conclude that the instruction could not assure that the jury considered and decided the central question in the case, i.e. whether Bennett gave assistance to the killer for the purpose of aiding him in his crime.

The instruction sets forth three elements. The first is that the crime was committed. That is not at issue in Bennett's appeal, because Bennett does not now assert

that Benson did not murder the victim.[4] The second element is that "before or during the crime, the defendant did something to assist in the commission of the crime." The use of the verb form "to assist" is confusing in that it can be interpreted to mean either that the defendant acted in order to assist in the commission of the crime or that the defendant's action, though not intended to aid in the commission of a crime, had that result. The third element provides that "the defendant must have intended the commission of the crime alleged or must have known that the other person intended its commission at the time of giving the assistance." I believe the phrase "must have known," rather than "knew," converts the standard from a subjective one to that of a reasonable person. While this is of little consequence in most cases in which the action in question could not have had any purpose other than assisting the commission of the crime, I believe it was central to the verdict in this case.

As already discussed, there was no evidence that Bennett wanted this crime to be committed. Indeed, the prosecutor recognized this when she stated in closing argument: "I'm not going to stand here and tell you that Paula Bennett wanted [Benson] to kill [McClure] necessarily. . . . I don't have to prove that." The question for the jury, then, was whether Bennett "must have known" that Benson intended to kill McClure. This instruction is capable of allowing a conviction based on gross negligence by Bennett because it readily allows the jury to apply a "should have known" standard. If, whether because of stupidity, fear, self-delusion, or some other reason, the aider provides the assistance with the

---

[4] But see the discussion later in this opinion regarding ineffective assistance of trial counsel due, in part, to the decision to argue that Benson did not commit the murder.

genuine subjective belief that it will not aid in a crime, then our system, which is based on personal culpability, cannot countenance a murder conviction. See *People v Usher*, 196 Mich App 228, 232-233; 492 NW2d 786 (1992) ("[T]o be convicted of aiding and abetting first-degree murder a defendant must . . . participate in the crime while *knowing* that a coparticipant possessed the requisite intent."), overruled in part on other grounds by *People v Perry*, 460 Mich 55, 64-65 (1999) (emphasis added).

Under our law, those who commit a homicide because of gross negligence, rather than as a result of an intent to kill, are guilty of involuntary manslaughter, not murder. The statutory punishment for involuntary manslaughter, while severe, is very different from that imposed for murder. It is difficult to understand, then, why someone who did not kill, but who, through gross negligence, aided a killer, should be sentenced as a murderer. Therefore, at least in the context of this case, the proper third element of the aiding-and-abetting instruction should require that "the defendant must have given the assistance with the intent that it aid in the commission of the crime" rather than that the defendant "must have known" what the killer's intent was.[5]

---

[5] This case is fundamentally different from that analyzed in *People v Kelly*, 423 Mich 261; 378 NW2d 365 (1985). In *Kelly*, the Supreme Court concluded that subjective knowledge of the precise crime ultimately committed was not an element of the offense of aiding and abetting, provided that the crime " 'was fairly within the criminal plan . . . .' " *Id.* at 278. Thus, although subjective knowledge of the precise offense ultimately committed is not required, there must still have been some "criminal plan" that the aider was aware of and chose to aid. This principle has since been applied, for example, to cases of armed robbery in which the abettor was aware of the intent to rob, but not that his or her coperpetrator planned to use a weapon. See, e.g., *Guilty Plea Cases*, 395 Mich 96, 130; 235 NW2d 132 (1975); *People v Young*, 114 Mich App

After a full and detailed review of the record, I conclude that there is a substantial likelihood that Bennett was convicted on the basis of a finding that she was grossly negligent in failing to recognize that her boyfriend intended to commit a murder at the time she provided the assistance. In the context of the unusual facts of this case, the criminal jury instruction creates a standard that allows for conviction of first-degree murder, not on the basis of an intent, but on the basis of gross negligence.

Bennett argues that there was insufficient evidence of her subjective intent and so her conviction should be vacated. While this is a close question, I conclude that a reasonable jury could infer that Bennett did subjectively know that Benson was going to the victim's house to kill her rather than simply recover the stolen property. However, the jury was never clearly asked to determine that question. Rather, the instruction could readily have been read to permit, *if not require*, that the jury apply an objective standard. In my view, Bennett's argument that the jury could not have found sufficient evidence of subjective intent implicitly raises the question whether the jury understood that this is what it was to determine. I recognize that defense counsel did not request a modification of the jury instruction. I believe that this failure to request a modification of the central jury instruction fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Smith v Spisak*, 558 US ___, ___; 130 S Ct 676, 685; 175 L Ed 2d 595, 604 (2010); *United States*

61, 65; 318 NW2d 606 (1982). Under *Kelly* and the other cases following it, the abettor must still be a voluntary participant in a criminal plan. The issue in this case, which the jury did not answer, is whether Bennett understood at all that she was assisting in a criminal enterprise.

*v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657
(1984); *Strickland v Washington*, 466 US 668, 688, 694;
104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Frazier*,
478 Mich 231, 243; 733 NW2d 713 (2007). And, as
already discussed, I conclude there were multiple other
errors that also contribute to my view regarding
whether Bennett received effective assistance.

Our system is not perfect and should not be held to a
standard of perfection. However, I do not believe that
we can affirm a conviction of first-degree murder—
particularly one based solely on an aiding-and-abetting
theory—when the jury was not properly advised what
the fundamental question was that it was to answer. We
should not uphold the imposition of a sentence of life
without parole when there remains a serious question
whether the jury accurately understood the nature of
the element of the offense primarily at issue. For this
reason, I conclude that Bennett's conviction should be
reversed and the case retried with a proper instruction,
i.e., one that explicitly requires that the defendant's
actions were taken with the actual knowledge that the
assistance they provided would be used to accomplish a
murder or some criminal plan in which the murder of
the victim was " 'fairly within the criminal plan . . . .' "
*People v Kelly*, 423 Mich 261, 278; 378 NW2d 365
(1985).[6]

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

As already discussed, I believe defense counsel's
failure to request a proper instruction on the only
element at issue constituted ineffective assistance of
counsel. However, I also conclude that, even absent that

---

[6] See n 5 of this opinion.

error, other actions by defense counsel would require that we remand this case for a *Ginther* hearing.

There was overwhelming evidence that Benson committed this cold-blooded murder. Further, there was no evidence to contradict the testimony of Larvaidan that Bennett provided Benson with the location of the victim's trailer. Both the practicality of trial tactics and the actual events as related by multiple witnesses mandated the defense that Bennett did not believe that Benson would murder the victim and that she did not want any harm to come to the victim. In terms of trial strategy, the entire defense effort would have to focus on separating Bennett's actions from Benson's in the eyes of the jury.

Even Benson's counsel expected that this would be the core of Bennett's defense, because before the onset of trial, he moved to sever his client's case from Bennett's. Benson's counsel filed an affidavit that stated "[t]hat the defenses [of Benson and Bennett] are antagonistic and [Benson] will contend that he had nothing to do with the murder of Stephanie McClure[. T]herefore *the defenses will be mutually exclusive and irreconcilable and not simply inconsistent.*" (Emphasis added.) Benson's counsel recognized that the evidence of Bennett's own statements that Benson shot the victim would be admissible at a joint trial because, although they were out-of-court declarations, they were the statements of a defendant and therefore admissible under MRE 801(d)(2). At the hearing on Benson's motion, the prosecutor objected to separate trials, but indicated that she would not object to separate juries. Benson's counsel was satisfied with this approach because it ensured that his client's jury would not hear Bennett's statements that Benson shot the victim.

Bennett's counsel made no argument at the hearing, and the trial court entered an order for a single trial with separate juries.[7]

Bennett's counsel originally appeared to recognize his client's best defense because he argued at the preliminary examination:

> [T]he evidence I heard, at least indicates that [Bennett] spent all day trying to, um, basically diffuse [sic] this situation. She kept repeatedly saying all she wanted was her property back, and that she didn't want anybody to be injured or killed.
>
> * * *
>
> And, also from statements, first that, uh, she had indicated that she was trying to calm things—that the testimony indicated that she was trying to calm things down, and, no matter how aggravated, uh, Mr. Benson may have been. Secondly, uh, that she disbelieved that he was gonna act. I think that these two things are inconsistent with being an aider and abettor.

However, at trial, Bennett's counsel did little, if anything, to present this defense. Instead, he adopted what appeared to be a "team" strategy with Benson's counsel and even during closing focused on the premise that Benson did not kill McClure:

---

[7] In retrospect at least, the decision to allow the cases to be tried together, but with separate juries, left Bennett with the worst of both worlds. The Bennett jury heard all the details of Benson's cold-blooded murder and were presumably justifiably outraged. In addition, they saw the two defendants and their counsel put forward a unified defense. However, the only person they could punish was Bennett. Had Bennett's case been tried separately, much of the evidence concerning Benson would not have been received by the jury. Had the two cases been tried before a single jury, that jury's outrage would have focused primarily on Benson, rather than falling solely on Bennett.

> My client is not charged with killing anybody. What she is charged with is what's called aiding and abetting. In order to be guilty of aiding and abetting, the first thing, and this is as [the prosecutor] said, regardless of the other jury, you have to be convinced that Kyron Benson committed a murder. Because if he's not guilty, she didn't aid and abet him.

Given that Bennett's jury, unlike Benson's jury, had heard multiple witnesses testify that Bennett told them that Benson killed McClure, it is difficult to fathom why her counsel tried to argue to the jury that Bennett should be acquitted because Benson did not commit the murder. This was even more peculiar given Larvaidan's eyewitness testimony clearly demonstrating that Benson committed the murder. Nevertheless, in his closing argument, Bennett's counsel spent more time arguing that there was reasonable doubt regarding the guilt of Benson than he did arguing that despite Benson's evident guilt, Bennett should not be convicted of aiding and abetting. This bizarre focus on Benson's possible innocence was not merely a useless argument; it was wholly counterproductive because, by "defending" Benson, Bennett's attorney linked her fate to his. If Bennett's counsel was going to argue that Benson did not kill McClure in the face of all the evidence to the contrary, including Bennett's own statements, he greatly undercut the argument that Bennett did not know Benson intended to kill McClure. By tying Bennett's defense to Benson, rather than conceding Benson's guilt and focusing solely on Bennett being in the wrong place at the wrong time and not realizing what Benson was going to do, Bennett's counsel created a scenario that made it appear as though both defendants were in the scheme together, making Bennett's best defense seem even less probable.

The perception that defendants were trying the case together was only enhanced when Benson's counsel deferred to Bennett's counsel to conduct the entire cross-examination of the medical examiner. Why Bennett's counsel chose to conduct that examination on behalf of both defendants remains a mystery, particularly given that the medical examiner's testimony had nothing to do with Bennett's defense. Indeed, during closing arguments, Bennett's counsel told the jury, "We spent a lot of time listening to evidence and a lot of it didn't have a darn thing to do with my client." The decision to have Bennett's counsel cross-examine the medical examiner only served to further connect both defendants in the jury's mind, thereby creating prejudice to Bennett.

In addition, I question Bennett's counsel's decision not to impeach Kandler with her preliminary-examination testimony. Kandler was the only witness who testified at trial that she believed Benson's threats. However, Kandler admitted at the preliminary examination that in her statement to the police, she wrote that she "didn't really think he was gonna do it," meaning she didn't think Benson was going to kill McClure. Kandler further testified at the preliminary examination that she thought Benson was "just blowing off steam" and agreed that she never actually thought that Benson was going to kill somebody that evening. At trial, when Benson's attorney attempted to question Kandler regarding her previous statements, the trial court sustained the prosecution's objection that whether Kandler thought Benson was serious was irrelevant. Although Kandler's testimony may have been irrelevant with regard to Benson, it was certainly relevant with regard to Bennett, particularly given that Kandler was the only person to testify at trial that she believed Benson's threats. However, Bennett's counsel

never challenged the trial court's ruling regarding the relevancy of Kandler's previous statements about Bennett and, therefore, foreclosed his opportunity to impeach the only witness who indicated that Benson's threat seemed worthy of belief.

To the extent that one may argue that the instructional error was waived, I question the decision of Bennett's counsel not to request an instruction on being an accessory after the fact. Granted, it is arguable that her attorney elected to go for an "all or nothing" defense, which is not necessarily ineffective assistance of counsel. *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982). However, given that the price of that decision was to risk life in prison without the possibility of parole, I believe that this should be explored at a *Ginther* hearing as well.[8]

Finally, although I recognize that the law does not require an on-the-record waiver of a defendant's decision not to testify, *People v Simmons*, 140 Mich App 681, 684; 364 NW2d 783 (1985), I am concerned about the lack of such a record under the circumstances of this case. Given the nature of the defense presented, it certainly would have been helpful to a reviewing court to have a record of the nature of Bennett's understanding regarding her rights and the risks and benefits of

---

[8] I recognize that the trial court would not have been required to give this instruction. *People v Perry*, 460 Mich 55; 594 NW2d 477 (1999). However, it would have been within the trial court's discretion to do so. *Id.* at 63 n 19. Further, given the risk that Bennett's "jury might have chosen to convict [her] not because it [was] persuaded that [she was] guilty of capital murder, but simply to avoid setting [her] free," *id.* at 73-74 (BRICKLEY, J., dissenting) (quotation marks and citations omitted), it seems unreasonable for her counsel not to have attempted to provide an avenue for the jury to punish Bennett without subjecting her to imprisonment for life without parole.

testifying.[9] As with the other issues just discussed, I believe this issue should be explored at a *Ginther* hearing.

### IV. SENTENCING AND THE PRINCIPLE OF PROPORTIONALITY

While it may be of little consequence to Bennett, I suggest that this case is an example of why the Legislature should consider amending MCL 767.39, which mandates that someone convicted of aiding and abetting be subject to the same punishment as the primary offender. Under our system of indeterminate sentencing, a trial court retains broad discretion in fashioning the sentence of the abettor based on his or her individual culpability, extent of involvement, intent, and other factors. Thus, although the abettor will receive the same statutory maximum, his or her minimum term will vary, depending on the circumstances, from that of the primary offender. One could argue that such discretion is required by due process given that the ultimate basis for our criminal law is individual culpability. "[T]he criminal law . . . is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpability." *Mullaney v Wilbur*, 421 US 684, 697-698; 95 S Ct 1881; 44 L Ed 2d 508 (1975), cited with approval by the Michigan Supreme Court in *People v Aaron*, 409 Mich 672, 711; 299 NW2d 304 (1980).

However, in the setting of first-degree murder, the sentence is not indeterminate. It is determinate—life in prison without the possibility of parole. I question

---

[9] This might also have cleared up any concerns arising out of statements made by Bennett's counsel at the preliminary examination that Bennett had been beaten by Benson and "there may be a basis for her being fearful of [Benson] [t]hat might lead her to, uh, say things that would be more harmful to herself and protective of [Benson]."

whether a blanket application of that punishment to an abettor, regardless of the circumstances and his or her individual level of culpability, is consistent with due process. It is certainly not consistent, at least in some cases, with the principle of proportionality. See *People v Bennett*, 241 Mich App 511, 517; 616 NW2d 703 (2000) ("By sentencing defendant to life imprisonment, the sentencing court 'has left no room for the principle of proportionality to operate on an offender convicted of [criminal sexual conduct] who has a previous record for this kind of offense or whose criminal behavior is more aggravated than in [defendant's] case.' "), quoting *People v Milbourn*, 435 Mich 630, 668-669; 461 NW2d 1 (1990) (alterations in *Bennett*); see also *People v Smith*, 482 Mich 292, 305; 754 NW2d 284 (2008) (" '[T]he appropriate sentence range is determined by reference to the principle of proportionality; it is a function of the seriousness of the crime and of the defendant's criminal history.' ") (citation omitted). Thus, I respectfully suggest that the Legislature consider allowing the sentencing court some degree of discretion in sentencing defendants who are found guilty on an aiding-and-abetting theory when the primary offense carries a determinant sentence.

V. CONCLUSION

In a system of justice based on individual culpability, I do not believe we can properly affirm a first-degree-murder conviction purely on the basis of an aiding-and-abetting theory when there is a serious question whether the jury ever made a determination regarding the defendant's subjective intent, knowledge, and individual culpability. Thus, I believe we should reverse Bennett's conviction and remand her case for a new

Opinion by Shapiro, J.

trial. Alternatively, I believe we should remand her case for a *Ginther* hearing to address the concerns regarding her representation I have raised in this dissent.