# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRETT EDWARD BALDRIDGE,

Defendant-Appellant.

UNPUBLISHED
January 9, 2018

No. 330960
Calhoun Circuit Court
LC No. 2015-000919-FC

---

Before: O'CONNELL, P.J., and HOEKSTRA and SWARTZLE, JJ.

PER CURIAM.

A jury convicted defendant, Brett Edward Baldridge, of assault with intent to commit murder (AWIM), MCL 750.83, first-degree home invasion, MCL 750.110a(2), two corresponding counts of use of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and aggravated stalking, MCL 750.411i(2). The trial court sentenced Baldridge to 225 months to 40 years for AWIM, 95 months to 240 months for home invasion, two consecutive sentences of 24 months each for each count of felony-firearm, and 24 months to 60 months for aggravated stalking.[1] The trial court ordered the sentences for AWIM and home invasion to run consecutively both during the original sentencing and on resentencing. Baldridge appeals by right his AWIM conviction and his consecutive sentences. We affirm.

## I. BACKGROUND

Baldridge and the victim started dating in May 2013. The victim ended their relationship in November 2014, and Baldridge moved out of the house. After the break-up, Baldridge once returned to the house with the victim's permission to help her when she was sick. Baldridge later began showing up at the victim's house unannounced. When the victim told Baldridge that she no longer wanted to speak to him, he persisted in messaging her, alternating between begging her

---

[1] After filing the claim of appeal, Baldridge filed a motion to remand for resentencing, which this Court granted, *People v Baldridge*, unpublished order of the Court of Appeals, entered March 20, 2017 (Docket No. 330960). On remand, the trial court reassessed prior record variable 5 at zero points and resentenced Baldridge accordingly. The sentences listed are the sentences ordered on resentencing.

to take him back and threatening to kill her and himself.  By December 2014, the victim stopped responding to Baldridge's messages, had the locks changed, and obtained a protective order.

On the night of December 24, 2014, Baldridge broke into the victim's house while she was asleep.  The victim woke up to find the lights on in her bedroom and Baldridge standing over her bed, scrolling through her phone.  Baldridge threw the phone against the wall when the victim tried to take it from him.  At this point, the victim noticed that Baldridge had a shotgun.  Afraid that he was going to kill her, the victim tried to take the shotgun, but Baldridge quickly grabbed it back and kept hold of it.  Baldridge and the victim argued because she wanted him to leave.  Baldridge pointed the shotgun at the victim and shot her in the leg, hitting her right inner thigh and disrupting a major artery.  Baldridge called 911 and told the 911 operator there had been a murder-suicide.  At the same time, the victim was screaming for help.  A transcription of the 911 call shows that Baldridge said he was "blowing [his] head off right now" and was "going to blow [her] head off before they get here."  While he was on the phone with the 911 operator, Baldridge fired a shot into the ceiling.  Baldridge left before the police arrived.

When police officers arrived at the victim's house, they broke the victim's bedroom window, covered the broken glass with pillows, pulled the victim out through the window, and took her to a nearby intersection to wait for an ambulance because she looked like she was starting to go into shock.  A trauma surgeon described the seriousness of the wound, explaining that the shotgun was a high-velocity weapon that caused extensive tissue damage to the area surrounding impact and stopped circulation to the leg.  The victim required immediate surgery to save her life and to reestablish circulation to the leg to avoid amputation.  She had ten more surgeries over the course of several months after the shooting.

At sentencing, the victim described the effects of the assault and the gunshot wound.  She was in treatment for post-traumatic stress disorder.  She lost her job, her home, and her independence.  Unable to live alone, she depended on family and friends because daily activities, like walking up and down stairs and getting in and out of a car, were now arduous or impossible.

## II.  DISCUSSION

### A.  SUFFICIENCY OF THE EVIDENCE

Baldridge argues that the evidence was insufficient for the jury to find intent to murder because he shot the victim in the leg and called 911 after he shot her.  We disagree.

We review a challenge to the sufficiency of the evidence de novo.  *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002).  This Court views the evidence in the light most favorable to the prosecution "to determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt."  *People v Bennett*, 290 Mich App 465, 471-472; 802 NW2d 627 (2010).  We "must draw all reasonable inferences and make credibility choices in support of the jury verdict."  *People v Cameron*, 291 Mich App 599, 613; 806 NW2d 371 (2011) (quotation marks and citation omitted).

"The elements of assault with intent to commit murder are:  (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder."  *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (quotation marks and citation omitted).  AWIM

is a specific intent crime. *Id*. at 148. An "intent to inflict great bodily harm or a wanton and willful disregard of the likelihood that the natural tendency of the acts will likely cause death or great bodily harm" does not equate to an intent to commit murder. *Id*. at 150, quoting *People v Taylor*, 422 Mich 554, 567; 375 NW2d 1 (1985). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and citation omitted). The jury may infer intent from "the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made." *Taylor*, 422 Mich at 568 (quotation marks and citation omitted). The jury may also "infer intent to kill from the use of a dangerous weapon." *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993).

In this case, considering the evidence in a light most favorable to the prosecution, a reasonable jury could conclude that Baldridge intended to commit murder. Baldridge threatened to kill the victim before the assault and during the assault, also stating that threat to the 911 operator after shooting the victim. The victim repeatedly described Baldridge as being mad during the assault, causing her to fear for her life. After he turned himself in, Baldridge admitted to the police that he was familiar with guns. In addition, the "high-velocity" type of shotgun that he used for hunting inflicted a life-threatening injury, and Baldridge admitted to the police that he knew the inherent danger of guns. Therefore, we hold that the evidence was sufficient to justify a rational trier of fact to find beyond a reasonable doubt that Baldridge assaulted the victim with the intent to commit murder.

## B. SENTENCING

Baldridge next argues that the trial court abused its discretion by ordering that the sentences for the AWIM conviction and the first-degree home invasion conviction run consecutively to each other without providing specific reasons for doing so and without considering mitigating factors. We disagree.

The home invasion statute gives sentencing courts the discretion to impose a consecutive sentence for first-degree home invasion. MCL 750.110a(8). We review a trial court's decision to order a consecutive sentence "for an abuse of discretion, i.e., whether the trial court's decision was outside the range of reasonable and principled outcomes." *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016). The sentencing court must "set forth the specific reasons underlying its decision." *Id*. at 664. Although there is no dispositive list of factors the trial court should consider in ordering consecutive sentences, a trial court must speak in more than "general terms" when ordering consecutive sentencing. See *id*. at 666.

We conclude that the trial court provided specific reasons supporting its decision to order consecutive sentences for AWIM and first-degree home invasion. The trial court explained the extent of the fear inspired by the circumstances, beginning with stalking and culminating in Baldridge's breaking into what should have been the safety of the victim's bedroom and shooting her. The trial court described the circumstances as "unique enough, violent enough," and scary

enough to justify consecutive sentences. The trial court adequately explained its reasoning, so it did not abuse its discretion by determining that the offenses warranted consecutive sentences.[2]

In sum, we affirm Baldridge's conviction for AWIM and the trial court's imposition of consecutive sentences for AWIM and first-degree home invasion.

/s/ Peter D. O'Connell
/s/ Joel P. Hoekstra
/s/ Brock A. Swartzle

---

[2] Baldridge contends that, on resentencing, the trial court improperly relied on the reasoning of the now-retired judge who presided over the trial and originally sentenced Baldridge. The second judge's comments about the original judge's experience and reasoning signaled agreement with the original judge's reasoning, not an abdication of decision-making. Moreover, the second judge independently gave specific reasons for ordering consecutive sentences.