# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AUBREY EARL RYE, JR.,

        Defendant-Appellant.

UNPUBLISHED
February 4, 2016

No. 323703
Grand Traverse Circuit Court
LC No. 14-011849-FC

Before: RONAYNE KRAUSE, P.J., and GADOLA and O'BRIEN, JJ.

PER CURIAM.

Defendant, Aubrey Earl Rye, Jr., was convicted of armed robbery, MCL 750.529, and sentenced as a fourth-offense habitual offender, MCL 769.12, to 20 to 30 years' imprisonment. We affirm.

## I. BACKGROUND

Shortly before 10:30 p.m. on December 8, 2013, a Wendy's restaurant was robbed in Interlochen, Michigan. Multiple witnesses testified that, after the restaurant had closed on that night, a man banged on the windows and doors of the restaurant. Believing it to be a coworker, Cody Newhouse, a cook and cashier, opened the door to the man, who he recalled was wearing a "big jacket," sweatshirt, jeans, gloves, and "a scarf over his face." Upon opening the door, the man told Newhouse that Wendy's was being robbed and that if he called the police, he would "be shot." Newhouse explained that he believed the man had a gun because he kept his left hand in his pocket during the encounter as well as threatened to shoot him "a good five, six times." Newhouse recalled that he could smell alcohol from the man "as soon as he walked into the store." Justin Compton, the grill operator who was also present at the time of the robbery, corroborated Newhouse's testimony, explaining that he assumed that the man had a gun because he kept his left hand in his pocket the entire time. Christopher Batchelder, the store manager who was also present at the time of the robbery, additionally explained that the man kept "[h]is left hand . . . in the pocket the whole time" and "kept on saying it over and over and over, he doesn't want to hurt us but if you come after us or you call the cops, I'm going to come back and shoot you." Like Newhouse, he believed that the man was wearing a black Carhartt jacket, a hooded sweatshirt, jeans, and winter boots. He also said that the man had a bandana and smelled of alcohol.

-1-

Earlier in the evening on the 8th, defendant and his sister, Jennifer Rye, were drinking alcohol together and decided to go for a walk in downtown Interlochen; however, defendant and his sister eventually went in different directions. At some point that evening, defendant's sister exchanged Facebook messages with Misty Meade, an acquaintance of both defendant and his sister, regarding defendant's expressed desire to commit a robbery. While defendant's sister described those messages as mere jokes, Meade apparently did not believe that they were jokes and also recalled an occasion "about two or three months prior" when defendant had made comments about wanting to rob a Wendy's. Coincidentally, Meade was the assistant manager of the Wendy's restaurant in Interlochen that was robbed that evening. She was contacted by the Wendy's employees who were at the restaurant when it was robbed and came immediately to the restaurant. After viewing the surveillance videos of the robbery, both she and Batchelder were eventually able to identify defendant as the individual who committed the robbery.

Shortly after the robbery, defendant visited the home of Bridget Lohner, who recalled that defendant "was wearing a dark hoody sweatshirt with a bandana around his neck, jeans and a pair of boots." Lohner explained that after offering to "pay [her] to let [him] in," she allowed defendant into her home but did not accept any money. She stated that defendant smelled of alcohol and was carrying a significant amount of cash that she recognized as suspicious because of the way it was paper clipped together. After Lohner learned that defendant might have robbed Wendy's, she made him leave her home. Also at some point after the robbery, defendant visited the home of Charles Jones wearing "a black jacket and had a bandana around his neck." Defendant apparently attempted to repay an outstanding debt between him and Jones and also requested permission to stay in Jones's home for a while. Jones declined in both respects.

During and after the robbery, defendant's sister, now joined by a friend, apparently continued her walk. Michigan State Police Trooper Jeffrey Crofoot observed them walking on the side of a street in Interlochen near the Wendy's shortly after the robbery and approached them. While speaking with them, a description of the robbery suspect was made over Crofoot's radio, and defendant's sister immediately stated that it "sound[ed] like [her] brother." She stated that when they went on their walk, defendant was wearing a Carhartt jacket and jeans and explained that he always carries a bandana. Defendant was eventually arrested by law enforcement later that evening. At the time he was arrested, he was wearing "a black Carhartt type jacket," "a gray hoody coming out from out of his jacket," and a black and white bandana. He also smelled of alcohol and had a significant amount of cash that included a bank deposit slip on his person. Michigan State Police Trooper Mike Moyes testified at trial that he was able to observe footprints in the snow going from Wendy's to Lohner's and from Lohner's to where he first observed defendant. Crofoot testified that the boots that defendant was wearing when he was arrested were very similar to the bootprints left behind by the suspect at the scene.

Defendant was charged with armed robbery, MCL 750.529, and a jury found him guilty of the same. In his defense, defendant primarily argued that because no witnesses saw a firearm during the robbery, he should be found guilty of robbery, MCL 750.530, not armed robbery. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 20 to 30 years' imprisonment, and this appeal followed.

## II. ANALYSIS

## A. MOTION FOR MISTRIAL

On appeal, defendant first argues that the trial court abused its discretion in denying his motion for mistrial. Specifically, defendant moved for a mistrial after the following testimony took place:

> *Prosecutor*: How do you know the defendant in this case, Aubrey Rye?

> *Witness*: The first time I met Aubrey was through his sister, Jen at their house, Connie's house, he lives about a block away, it was the first time I met him, his first day out of prison.

Defendant claims that the last portion of the witness's response—"his first day out of prison"—deprived him of his constitutional right to a fair trial. We disagree.

A trial court's decision on a motion for mistrial is reviewed for an abuse of discretion. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). A trial court should exercise its authority to grant a mistrial with caution and do so only when a prejudicial irregularity occurs that impairs a defendant's right to a fair trial. *Id*. Stated differently, a trial court should grant a mistrial only when the error is so egregious that its prejudicial effect cannot be removed in any other way. *People v Gonzalez*, 193 Mich App 263, 266; 483 NW2d 458 (1992).

In this case, we conclude that the trial court did not abuse its discretion in denying defendant's motion for mistrial because the witness's answer to the prosecutor's question was unresponsive. As a general rule, "unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness could give unresponsive testimony or the prosecution conspired with or encouraged a witness to give that testimony." *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990); see also *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). Here, the witness, Meade, was asked how she knew defendant. She responded accordingly, answering that she knew him "through his sister" and due to the proximity of their homes. She then added that the first time that she met him was when he was released from prison. This was unresponsive. The prosecutor did not ask when she first met him or where he was coming from before that interaction. Further, there is nothing to suggest that the prosecutor had any knowledge that she would mention prison in response to that question or that the prosecutor conspired to obtain such a response. Conversely, the record demonstrates that the prosecutor instructed the witness not to mention prison, that the witness recalled being instructed accordingly but forgot that instruction, and that the witness was apologetic for doing so. Thus, we conclude that the witness's response was unresponsive and, therefore, not grounds for mistrial. *Hackney*, 183 Mich App at 531; *Haywood*, 209 Mich App at 228.

In any event, even if we assume that the witness's answer was responsive, defendant was nevertheless not deprived of his constitutional right to a fair trial because the error was not so egregious that its prejudicial effect could not be removed in any other way. *Gonzalez*, 193 Mich App at 266. The witness's comment was brief and vague. She did not, for example, elaborate as to when, why, or for how long defendant was incarcerated. Moreover, the trial court's jury instructions presumptively cured any prejudice, *People v Mahone*, 294 Mich App 208, 212; 816

NW2d 436 (2011), and defendant has failed to overcome that presumption. Specifically, the trial court instructed the jury that witness's "reference to the fact the defendant may have been confined in prison" "has absolutely no bearing on any issue you must decide, it is not evidence and should not be used as such" "[w]hether or not the fact is true." Finally, as illustrated above, the evidence against defendant was extraordinarily strong in this case.

Accordingly, we conclude that the trial court did not abuse its discretion in denying defendant's motion for a mistrial. We also conclude that defendant was not deprived of his constitutional right to a fair trial based on the improper testimony.

## B. PROSECUTORIAL MISCONDUCT

Defendant also argues that he was deprived of his constitutional right to a fair trial due to prosecutorial misconduct. Specifically, defendant takes issue with the following statement by the prosecutor at the conclusion of his closing argument:

> That is the evidence that I think is important in the case. And, again, I'm not pretending to give you all of the reasons why I think the defendant's guilty, you'll think of other facts yourself that you think are important, okay. But, hopefully I've given you my argument, and I do believe that the defendant is guilty beyond a reasonable doubt in this case of armed robbery and I ask you to find the defendant guilty as charged.

Defendant claims that the prosecutor's statement regarding his personal beliefs—"I do believe that the defendant is guilty beyond a reasonable doubt"—automatically entitles him to a new trial. We disagree.

"Issues of prosecutorial misconduct are reviewed de novo to determine whether the defendant was denied a fair and impartial trial." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Issues of prosecutorial misconduct are decided on a case-by-case basis, and the reviewing court must examine the entire record and consider the allegedly improper remarks in context. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). While prosecutors are generally afforded great latitude in their arguments, they should not express their personal opinion of a defendant's guilt. *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995). Improper remarks by the prosecutor rise to the level of prosecutorial misconduct and require reversal when they deprive a defendant of his or her right to a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007).

Assuming that the prosecutor's use of the words "I believe" in his closing statement was improper, we nevertheless conclude that any error was harmless. Defendant was not deprived of his constitutional right to a fair trial because the trial court's jury instructions presumptively cured any prejudice, *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008), and defendant has failed to overcome that presumption. Immediately after the alleged error, the trial court explained to the jury that "there was an error made by the prosecutor in inserting his own personal belief as to whether or not the crime was committed." It then instructed them as follows:

Whether or not the crime was committed is for you to decide based on the evidence, not on whether or not either of these attorneys believes what they are doing, it's irrelevant. If what they believe was important I would have sworn them in and they would have testified. I want you to disregard any personal opinion offered by the prosecutor about what he believes or doesn't believe, look at the evidence and ultimately decide from the evidence if you believe whether the elements of the crime have been proved beyond a reasonable doubt.

Defendant does not explain why this instruction was inadequate or make any other attempt to overcome the presumption that it, as well as the other instructions provided by the trial court, cured any error. In light of those curative instructions, we conclude that any error was harmless.

Accordingly, we conclude that defendant was not deprived of his constitutional right to a fair trial based on the alleged prosecutorial misconduct.

## III. CONCLUSION

In sum, because the trial court did not abuse its discretion in denying defendant's motion for a new trial, because the prosecutor did not commit prosecutorial misconduct, and because defendant was not deprived of his constitutional right to a fair trial, we affirm his conviction and sentence.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael F. Gadola
/s/ Colleen A. O'Brien