# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAMIAN MATHEW MASSA,

Defendant-Appellant.

UNPUBLISHED
July 12, 2016

No. 326215
Oakland Circuit Court
LC No. 2013-247283-FH

Before: RIORDAN, P.J., and SAAD and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of receiving and concealing stolen property valued at $20,000 or more, MCL 750.535(2)(a), and filing a false tax return, MCL 205.27(1)(a). [1]  He was sentenced to one year in jail, with one day of jail credit, and five years of probation for both convictions.  We affirm.

## I. FACTUAL BACKGROUND

This case arises from defendant's ownership and operation of RTR Sales, Inc., a company through which he bought and sold plastic knockdown containers. [2]  Most relevant to this appeal, defendant's receiving and concealing stolen property conviction arises from his possession of more than 1,000 of those containers owned by General Motors ("GM").

All GM containers are manufactured with a stamp or "embossment" of a GM logo that is "molded" onto the base.  Most GM containers are blue and gray, although some are other colors. At trial, various employees or representatives of GM and its suppliers, as well as other witnesses involved in the container industry, testified that GM never sold its plastic knockdown containers, that GM containers remained "active [GM] assets" used in the transportation of parts to and from GM assembly plants, and that GM never relinquished ownership of the containers.  Accordingly, if GM became aware that containers were in the possession of another company, GM made an

---

[1] Defendant was acquitted of 10 other offenses.

[2] Plastic knockdown containers are collapsible, rectangular-shaped shipping containers that come in a variety of colors and sizes depending on their intended use.

effort to retrieve them. Despite GM's efforts, however, companies, including GM suppliers, and individuals sometimes sold GM containers at public actions or through private sales even though such sales were not authorized. This created a "secondary market" for GM containers that was "offensive to [GM]."

In 2011 and 2012, the Livonia Police Department and other local police departments discovered that stolen knockdown containers were being acquired, purchased, and sold by various individuals, including, among others, Ed Spratt, Jim Tabor, and Norm Syrjala. As the police further investigated the stolen knockdown container market, they made multiple arrests. Most notably, in April 2012, Syrjala was arrested by Livonia police officers as he was on his way to deliver stolen containers to defendant's warehouse on Crestview Road in Farmington Hills, Michigan.

In May 2012, with the assistance of Syrjala and Larry Anderson, who was responsible for "[c]ontainer repair, warehousing and expendable claims" for GM, the Livonia Police Department performed multiple stings using containers provided by GM, which had been marked by Livonia Police Department Sergeant Michael Mockeridge. During the May 7, 2012 sting, Michael Bertha, an undercover Livonia police officer, posed as one of Syrjala's employees while Syrjala delivered GM containers, with an embossed GM logo, to defendant's Crestview warehouse. When Bertha and Syrjala arrived, David Wendler, defendant's warehouse manager, retrieved the containers from the truck. Wendler paid Syrjala for the GM containers by filling in a blank check, which had been signed and dated by defendant on April 23, 2014. Bertha and Syrjala executed similar controlled deliveries of GM containers on May 21, 2012.

On May 23, 2012, the Livonia police executed a search warrant at defendant's Farmington Hills warehouses (located at 24740 Crestview and 24796 Crestview), seizing 52 of the 190 shipping containers obtained from GM and marked by Detective Mockeridge and hundreds of other containers that belonged to GM and that were in defendant's possession without GM's permission. Later that day, a search warrant was executed at defendant's residence, at which time various items were seized and defendant was arrested.

## II. PROBABLE CAUSE TO SEARCH DEFENDANT'S RESIDENCE

Defendant first argues that the trial court erred in denying his motion to suppress the evidence seized during the search of his residence because the search warrant was not supported by probable cause. We disagree.

### A. STANDARD OF REVIEW

"We review de novo a trial court's ruling on a motion to suppress evidence. The trial court's factual findings are reviewed for clear error, and the underlying constitutional issues, including whether a Fourth Amendment violation occurred, are reviewed de novo." *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). However, appellate review of a decision regarding whether probable cause existed to issue a search warrant "requires the reviewing court to ask only whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *People v Russo*, 439 Mich 584, 603; 487 NW2d 698 (1992). "[A] search warrant and the underlying affidavit are to be read in a

common-sense and realistic manner. Affording deference to the magistrate's decision simply requires that reviewing courts insure that there is a substantial basis for the magistrate's conclusion that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 604 (quotation marks and citation omitted); see also *People v Martin*, 271 Mich App 280, 297; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008).

## B. ANALYSIS

A warrant may not issue unless probable cause exists to justify the intended search. US Const, Amend IV; Const 1963, art 1, § 11; MCL 780.651; *People v Brown*, 297 Mich App 670, 675; 825 NW2d 91 (2012). "Probable cause to issue a search warrant exists where there is a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place," *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000), or "when the facts and circumstances would allow a reasonable person to believe that the evidence of a crime or contraband sought is in the stated place," *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009).

> Probable cause must be based on facts presented to the issuing magistrate by oath or affirmation. When probable cause is averred in an affidavit, the affidavit must contain facts within the knowledge of the affiant rather than mere conclusions or beliefs. The affiant may not draw his or her own inferences, but must state the matters that justify the drawing of inferences. However, the affiant's experience is relevant to the establishment of probable cause. [*Id*. (citations omitted).]

Defendant's primary argument is that the facts stated in the affidavit did not establish a substantial basis for inferring any probability that evidence of a crime would be found at his residence. See *Kazmierczak*, 461 Mich at 417-418. Contrary to defendant's characterization of the affidavit, its sworn facts would allow a reasonable person to believe that evidence of a crime would be found at defendant's residence. See *Waclawski*, 286 Mich App at 698. The affidavit stated that Syrjala told Sgt. Mockeridge, the affiant, that (1) defendant had "partnered up" with Tabor, who was selling stolen containers, (2) stolen containers were being delivered to warehouses on Crestview Road, which were operated by defendant and Tabor, (3) defendant paid Syrjala $10 under the company name "Rags to Riches," in addition to the $40 paid by Tabor, for each plastic container delivered to the Crestview warehouses, each of which was stolen based on other facts stated in the affidavit, and (4) defendant often left several signed and dated checks which listed the "Rags to Riches" business name and his residential address (812 Meridian Road, Mason, Michigan 48854) with Wendler, which Wendler later used to pay for stolen container purchases. The affidavit also stated that after a controlled delivery, Syrjala produced a check drawn from an account under the company name "Rags to Riches" at defendant's residential address. These facts provide a substantial basis from which a reasonable person could believe that evidence concerning the purchase and possession of stolen containers would be found at defendant's residential address. See *Kazmierczak*, 461 Mich at 417-418; *Waclawski*, 286 Mich App at 698. The existence of probable cause is not undermined by the fact that the affidavit indicates that defendant *also* organized business deals with legitimate businesses. Additionally, contrary to defendant's argument on appeal, the affidavit did not consist of unsupported conclusions or beliefs solely based on Sgt. Mockeridge's experience. See *Waclawski*, 286 Mich App at 698.

Defendant contends that the affidavit failed to establish that *he* engaged in criminal activity or had knowledge of criminal activity. Rather, he argues that the allegations in the affidavit only suggest that he was engaged in legal business transactions with legitimate businesses. Defendant fails to recognize that the relevant standard only requires that the affidavit establish probable cause to believe that evidence of a crime will be found in a particular place, *not* that a particular person is implicated in the criminal activity under investigation. See *Kazmierczak*, 461 Mich at 417-418; *Waclawski*, 286 Mich App at 698. See also *People v Johnson*, 431 Mich 683, 689-690; 431 NW2d 825 (1988) (discussing the different factual circumstances that must be shown to establish probable cause for a search and probable cause to arrest an individual). Nevertheless, contrary to defendant's portrayal of the affidavit, a reasonable person could infer from the facts in the affidavit that defendant was involved in the acquisition of stolen plastic containers through Syrjala and other suppliers, especially given the description of defendant's "partner[ship] . . . with Tabor," who engaged in the illegal acquisition of containers. These facts further increased the probability that evidence of a crime would be found at defendant's residence, where his business was located.

Finally, defendant argues, "Syrjala's credibility is, at best, highly questionable, and unsupported by any additional evidence or objectively assessable facts as to most of his allegations, short of the controlled delivery," which did not involve stolen containers, and which occurred while defendant was absent from the warehouse. However, affirmative allegations from which the magistrate could conclude that Syrjala was credible and that he provided reliable information were not required because Syrjala was not an unnamed informant. See MCL 780.653(b) (codifying the requirements that must be fulfilled before a warrant may be issued based on tips from an unidentified informant). Instead, because Syrjala was a named informant, the affidavit could be based upon information that Sgt. Mockeridge received from Syrjala as long as the affidavit included "affirmative allegations from which the magistrate [could] conclude that [Syrjala] spoke with personal knowledge of the information." MCL 780.653(a).[3] "Personal knowledge can be inferred from the stated facts." *Martin*, 271 Mich App at 302.

It is overwhelmingly apparent from the content of the affidavit that Syrjala had personal knowledge of the stated facts, especially given Syrjala's description of his own involvement in the acquisition of stolen containers and his direct involvement with defendant's business. Further, the extensive independent investigation performed by the police—which was described in detail by Sgt. Mockeridge in the affidavit and which, among other things, included three controlled deliveries to defendant's warehouse—corroborated much of the information provided by Syrjala. See *Waclawski*, 286 Mich App at 699; *People v Harris*, 191 Mich App 422, 425-426; 479 NW2d 6 (1991). "Michigan courts also consider identified citizens and police officers to be presumptively reliable." *People v Powell*, 201 Mich App 516, 523; 506 NW2d 894 (1993). Accordingly, the magistrate did not err in issuing the search warrant despite Syrjala's purported lack of credibility or reliability.

---

[3] MCL 780.653 was amended by 2014 PA 383, effective December 18, 2014. The amendments did not affect the substance of the statute.

Thus, especially given the great deference that we must afford to a magistrate's probable cause determination, *People v Keller*, 479 Mich 467, 477; 739 NW2d 505 (2007), the trial court did not err in denying defendant's motion to suppress because the magistrate properly concluded that probable cause existed to issue a search warrant for defendant's residential address, see *Russo*, 439 Mich at 603.[4]

## III.  SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that insufficient evidence was presented at trial to support his receiving and concealing conviction stolen property conviction.  We disagree.

## A.  STANDARD OF REVIEW

This Court reviews a challenge to the sufficiency of the evidence *de novo*.  *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014).  "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt."  *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (quotation marks and citation omitted).  "Circumstantial evidence and reasonable inferences arising [from the evidence] may constitute proof of the elements of [a] crime."  *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).  This Court's review is deferential, as "[w]hen assessing a challenge to the sufficiency of evidence, the trier of fact, not the appellate court, determines what inferences may be fairly drawn from the evidence and the weight to be accorded those inferences."  *People v Malone*, 287 Mich App 648, 654; 792 NW2d 7 (2010), overruled in part on other grounds by *People v Jackson*, 498 Mich 246, 268 n 9 (2015); see also *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) ("The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict.").  Thus, in reviewing a challenge to the sufficiency of the evidence, we do not interfere with the fact-finder's determinations regarding the weight and credibility of the witnesses or the evidence.  *Dunigan*, 299 Mich App at 582.

## B.  ANALYSIS

---

[4] Even if the affidavit failed to establish probable cause, the good-faith exception to the exclusionary rule would apply in this case.  See *United States v Leon,* 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1994); *People v Goldston*, 470 Mich 523, 528-530, 535-541; 682 NW2d 479 (2004).  There is no indication that the magistrate wholly abandoned his judicial role, see *id.* at 531, or that Sgt. Mockeridge was dishonest or reckless in preparing his affidavit, see *Leon*, 468 US at 926.  Additionally, the police officers' actions were objectively reasonable, as they reasonably relied, in good faith, on the search warrant.  See *Goldston*, 470 Mich at 530-531, 542. The affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Goldston*, 470 Mich at 528 (quotation marks and citation omitted).

To prove the offense of receiving and concealing stolen property valued at $20,000 or more, the prosecution must establish the following elements:

> (1) the property was stolen; (2) the value of the property met the statutory requirement; (3) defendant received, possessed, or concealed the property with knowledge that the property was stolen; (4) the identity of the property as being that previously stolen; and (5) the guilty actual or constructive knowledge of the defendant that the property received or concealed was stolen. [*People v Pratt,* 254 Mich App 425, 427; 656 NW2d 866 (2002).]

The basis of defendant's conviction was the seizure of hundreds of GM knockdown containers from his warehouse on May 23, 2012.[5] Defendant argues that there was no evidence that those containers were stolen because (1) 52 of the containers recovered were provided by GM and (2) there was no evidence that the rest of the containers were delivered to the warehouse by Spratt, Syrjala, or Tabor. Contrary to defendant's claim, numerous witnesses testified that GM containers, including those seized from defendant's warehouse, are "active [GM] assets"; that they remain the property of GM; that GM never relinquishes control of its containers, even if they are difficult to control; that GM supplies all of the containers utilized by its suppliers; that GM does not sell its containers on the open market; and that GM employs personnel who "aggressively" attempt to locate and recover containers from scrap companies or other entities. Although evidence was presented to the contrary—which, as defendant emphasizes, indicated, *inter alia*, that (1) GM has sold or consigned obsolete or damaged containers to scrap companies or suppliers, (2) GM has auctioned off automotive parts inside GM containers, (3) tier one or tier two suppliers may directly purchase GM containers and subsequently sell them on the open market, and (4) GM containers have been sold by other companies on the open market[6]—it was the jury's role to determine the weight and credibility of the witnesses' testimony. *Dunigan,* 299 Mich App at 582. Further, we must resolve all evidentiary conflicts in favor of the prosecution. *Id.* Thus, there was sufficient evidence from which a reasonable jury could conclude that the GM containers in defendant's possession were stolen. See *Pratt,* 254 Mich App at 427.

Next, defendant disagrees that he received, possessed, or concealed the GM containers. Although he argues that there was no evidence that he purchased any containers himself, this assertion is undermined by his own testimony at trial regarding his container deals and purchases. The evidence overwhelmingly established that Wardner worked on defendant's behalf to accept shipments of containers for RTR Sales, the company owned by defendant. Likewise, the extensive testimony regarding the container acquisition and payment process utilized by defendant's company, including defendant's own testimony, clearly demonstrated

---

[5] Defendant does not challenge whether the value of the property seized from the warehouse met the statutory requirement. See *Pratt,* 254 Mich App 427. Nevertheless, Anderson's testimony provided evidence from which the jury could conclude beyond a reasonable doubt that the containers seized were valued at more than $20,000.

[6] It is noteworthy that Swansey testified that the amount of effort that GM would invest in recovering containers depended on the quantity in a company's or an individual's possession.

that defendant, as the owner of RTR Sales, directly purchased and possessed GM containers. Wendler also testified that defendant was the one who established the terms of the container deals and payments.

Furthermore, although defendant was often absent from the warehouse when containers were delivered, there is no dispute that Wardner was required to inform defendant of the specific inventory received in each shipment, the condition of the containers, who delivered them, and the services performed on each container in order to receive payment for his services. Likewise, the documentation that Wardner submitted to defendant following each delivery listed the types of containers received, including blue and gray containers, and the testimony established that blue and gray containers were GM containers. Additionally, Wardner testified that he would call defendant whenever a load of containers arrived, and Wardner would specifically inform defendant of any GM boxes that were delivered or shipped. More so, in defendant's first statement to Sgt. Mockeridge, which he confirmed was accurate, he stated that he was aware that *his* warehouse contained GM containers.

Despite defendant's testimony, there was significant evidence from which the jury could infer that defendant attempted to conceal or minimize the fact that he routinely purchased numerous GM containers. Wendler testified that defendant asked him to store the blue and gray containers behind the mixed color containers so that "they weren't really out in the open." Defendant explained to Wardner that he wanted to make sure that the blue and gray containers were not in plain view so that no one would ask any questions about them. Defendant also instructed Wendler to intermix GM containers with containers of other colors so that it would not appear that "so many" GM containers were in a certain area, stating that he did not want all of the GM containers in one stack. Additionally, unless a container was shipped to RTR Sales specifically for repair, all GM logos were removed. Although defendant denied at trial that he asked Wendler to hide the containers, he emphasized that GM containers were frequently visible outside the warehouse, and he stated that he had legitimate reasons for removing the GM logos, we must view the evidence in the light most favorable to the prosecution. See *Dunigan*, 299 Mich App at 582. We also must draw all reasonable inferences and make credibility determinations in support of the jury's verdict. See *Nowack*, 462 Mich at 399-400. Although defendant emphasized that he informed James Lalley, the GM investigator, in 2011 that he sold GM containers, it is apparent from Lalley's testimony and other testimony regarding defendant's actions before and after his interactions with the GM investigator that defendant intentionally minimized and concealed the extent to which he purchased and sold GM containers—and the extent to which he was aware of his inventory—during his conversations with Lalley.

Finally, defendant contends that there is no evidence that he had actual or constructive knowledge that the containers were stolen. "Guilty knowledge generally cannot be proved by direct evidence; by its very nature, it must usually be inferred from all of the circumstances of the case." *People v Salata*, 79 Mich App 415, 421; 262 NW2d 844 (1977).

> Factors which have been held to support the inference of guilty knowledge include: (1) the defendant's possession of the stolen article shortly after it was stolen, (2) change in the condition of the stolen article, (3) alteration of identifying marks, serial numbers, or registration, (4) a purchase price out of line

-7-

with the article's value, and (5) lack of any reasonable explanation from the defendant for his possession of the item. [*Id.* at 421-422.]

Here, the prosecution proffered direct and circumstantial evidence from which the jury could find that this element was proven beyond a reasonable doubt.

Previously, defendant was a salesman at Arca, and his largest customer was GM. Former and current GM employees, who worked directly with defendant while he was the salesman managing the GM account, confirmed that defendant was aware of GM's policy that it does not sell its containers. They explained that GM representatives would inform salesmen of this policy and provide a "containerization booklet" which also stated this policy. Likewise, Swansey testified that defendant had been "keeping an eye out, just like all of us would," "for . . . containers being where they shouldn't be," and that defendant had notified Swansey in the past when he learned that an entity improperly possessed GM containers. Based on information from defendant, Swansey "would send somebody . . . to check [the containers] out and get them back if they were [GM's]." Although defendant claimed that he only provided such information to Swansey in 1997 and 1998, and that the market began to change in 2000 and subsequent years, resulting in the development of a multi-million dollar container market, the jury could reasonably infer from this evidence that defendant was aware that GM did not sell its containers and retained ownership of them. See *Nowack*, 462 Mich at 400; *Bennett*, 290 Mich App at 472. Such a conclusion is further supported by the testimony of multiple witnesses that defendant minimized his involvement with GM containers when he spoke with a GM representative and briefly stopped purchasing and selling such containers after he was expressly informed by the representative that he was not permitted to sell them. Further, Tabor testified that when GM containers were delivered, defendant would "get them out right away so the warehouse was never too stockpiled with them."

In addition, Wardner expressly testified that he was aware that GM containers were stolen when they arrived at the warehouse. Wendler had this knowledge based on his prior work with Thrifty Pallet, another container company, when a GM investigator confiscated $400 or $500 worth of GM containers. At the time, the investigator explained that (1) Thrifty Pallet was not authorized to have those containers because they were not for sale, and (2) if the company did have GM containers in its possession, they were stolen. After the confiscation, Wendler told defendant about the incident. In response, defendant told Wendler that "everything would have been all right" if they had "gr[ound] off the GM logo[.]" Defendant's response is significant in that defendant asked Wardner to remove the markings of all GM containers delivered to defendant's warehouse. Although defendant explained that this business practice was for the convenience of their customers, the fact that defendant asked Wendler to change the condition of the containers and remove any identifying marks supports an inference of guilty knowledge, especially when considered in conjunction with defendant's previous conversation with Wendler. See *Salata*, 79 Mich App at 421-422.

Although defendant repeatedly denied at trial that he knew that the containers were stolen, again, we are required to resolve all evidentiary conflicts, and make all credibility determinations, in support of the jury's verdict. See *Nowack*, 462 Mich at 400; *Dunigan*, 299 Mich App at 582. The prosecution presented overwhelming direct and circumstantial evidence

from which the jury could conclude that defendant knew that the containers were stolen.  See *Nowack*, 462 Mich at 399-400; *Bennett*, 290 Mich App at 472.

Thus, the evidence presented at trial was sufficient to support defendant's conviction.

## IV.  CONCLUSION

The trial court properly denied defendant's motion to suppress, as the search warrant for defendant's residence was supported by probable cause.  Additionally, defendant's conviction was supported by sufficient evidence.

Affirmed.

/s/ Michael J. Riordan
/s/ Henry William Saad
/s/ Michael J. Kelly