# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOAQUIN RASHAD HUNTER,

Defendant-Appellant.

UNPUBLISHED
March 15, 2018

No. 334627
Wayne Circuit Court
LC No. 16-001309-01-FC

Before: MURRAY, P.J., and CAVANAGH and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, and assault with intent to do great bodily harm less than murder, MCL 750.84. The trial court sentenced defendant to concurrent terms of 30 to 60 years' for his second-degree murder conviction and 5 to 10 years' for his assault conviction. We affirm.

## I. BACKGROUND

This appeal follows a shooting that took place at 761 Lantz in Detroit, Michigan during the evening hours of May 18, 2014. The prosecution's main witness at trial was Floyd Shaw, who, after testifying and giving statements at several points during the lower court proceedings, could not recall details of the shooting at trial. Consequently, the prosecution introduced into evidence Shaw's testimony under oath during the investigative subpoena proceedings and the preliminary examinations of both Steven Garrett and defendant, in which Shaw detailed the events of the crimes and variously identified either defendant or Garrett as the shooter. This statement of facts is gleaned from Shaw's testimony throughout the lower court proceedings, introduced as evidence at defendant's trial.

During the day of May 18, 2014, Shaw, then 19 years old, was hanging out with his childhood friend Justin Stanley, also 19 years old, and defendant, another childhood friend, in their neighborhood in Detroit, Michigan. In the early evening, defendant sold some of Stanley's drugs for $5 and a protracted dispute over the transaction ensued between Stanley and defendant. In the interim, Shaw left the others, but he later met back up with Stanley at the home on Lantz Street. Mary Spalding, the victim's girlfriend and defendant's cousin, was also at the home but remained inside. Apparently, Stanley was still upset about the altercation with defendant and Stanley and Shaw went outside to sit on the porch and smoke a cigarette.

Defendant and Garrett subsequently arrived in a vehicle. Garrett remained in the driver's seat, while defendant went in the home. Defendant came back out almost immediately and, standing in the doorway, said to Stanley, "Come on brother let's go pop that bottle[,]" meaning "let's go get a drink." Stanley responded, "Naw, I ain't about to go pop no bottle because you Ns ain't about to set me up." Stanley and Shaw remained on the porch, while defendant rejoined Garrett and drove away.

Shortly after, Shaw heard and then saw defendant and Garrett creeping through the bushes from an adjacent field. Defendant and Garrett appeared on the porch steps. Shaw noticed that Garrett had his hoodie "tied up" even though it was not cold, prompting Shaw to ask, "Y'all trying to put some type of play down?" After further escalation of the dispute, culminating in Stanley "cussing out" defendant and Garrett, Shaw saw both Garrett and defendant reaching as if to pull out a gun. Defendant said, "Come on, Bro", and Garrett moved up the porch steps, pulled out a gun, and fired it multiple times. Shaw was hit in the leg but jumped off the porch and pretended he was dead. After defendant and Garrett ran away, Shaw went to Stanley, and overhead him say to Spalding, "Mary, your cousin shot me." Police transported Stanley to a hospital, but he died of multiple gunshot wounds.

Defendant fled to Ohio, but was extradited back to Michigan. The prosecution's primary evidence at trial was Shaw's recitation of the circumstances of the shooting and Stanley's statement to Spalding in the moments following the shooting as recounted by Shaw. However, at trial, as noted above, Shaw denied remembering the events of the crimes, insisting that he only knew that two unknown individuals approached the porch and that he heard a pop but did not see who shot the gun. Ultimately, the jury convicted defendant of second-degree murder and assault with intent to do great bodily harm less than murder. Defendant now appeals as of right.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the record evidence was insufficient to support his convictions where it does not establish beyond a reasonable doubt that he fired the shots that hit Shaw and Stanley. We disagree.

"This Court reviews de novo challenges to the sufficiency of the evidence. This Court must determine whether the evidence was sufficient to justify a rational trier of fact's conclusion that the evidence proved the essential elements of the crime beyond a reasonable doubt." *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016) (citations omitted). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks omitted). "[T]his Court should not interfere with the jury's role of determining the weight of evidence or the credibility of witnesses." *People v Lee*, 243 Mich App 163, 167; 622 NW2d 71 (2000).

"The elements of second-degree murder consist of (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014) (citation and quotation marks omitted). "The term 'malice' has been defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such

behavior is to cause death or great bodily harm." *Id*. at 9-10 (citation and quotation marks omitted). "The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm *less than murder*." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (citation, quotation marks and footnote omitted; emphasis in original).

In addition to arguing that defendant was culpable for these crimes as a principal, the prosecution also proceeded under an alternate theory that defendant acted as an aider and abettor.

The elements of aiding and abetting are

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010), quoting *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

The record evidence, viewed in the light most favorable to the prosecution, amply supported defendant's convictions of second-degree murder and assault with intent to do great bodily harm less than murder as both a principal as well as under an aiding and abetting theory. Shortly after he was shot, Stanley cried out to his cousin, Spalding, that defendant had shot him. In his testimony during the July 10, 2014 investigative subpoena proceedings, read into evidence at trial, Shaw stated that after defendant failed to lure Stanley into Garrett's vehicle by offering to go have a drink together, defendant and Garrett snuck through the bushes next to the house after walking through a field, rather than parking directly in front of the home, and confronted Shaw and Stanley on the front porch. At one point, according to Shaw, both defendant and Garrett were "reaching the same way" as if reaching for a firearm before shots rang out. While Shaw stated that Garrett was the person who fired the gun, he also noted that defendant was by Garrett's side throughout the altercation leading to the shooting, and the shooting itself, and fled with Garrett. During the investigative subpoena proceedings, Shaw was also questioned about his statement to the police in the days following these crimes, where he stated that defendant had pulled out a gun before shots rang out. However, Shaw later clarified that it was Garrett that pulled out the gun, but that both defendant and Garrett were "reaching" inside their waistbands. During the investigative subpoena proceedings, Shaw also acknowledged that he had first identified Garrett as the shooter in an initial police lineup, but then identified defendant as the shooter during a subsequent police line-up.

In his testimony at Garrett's October 15, 2014 preliminary examination, read into evidence at trial, Shaw described defendant and Garrett as "standing side-by-side" after they returned to the home after sneaking through the bushes. Although it was a warm May evening, Garrett had his hoodie tied up around his head, and at one point during the verbal altercation both defendant and Garrett "got to clutching[,]" according to Shaw, as if they were grabbing guns. Shaw testified that Garrett then pulled out a gun, and multiple shots rang out. Defendant and Garrett then ran away from the scene together. On cross-examination during Garrett's preliminary examination, Shaw reiterated that Garrett, not defendant, was the shooter, but then

later conceded that he had told the police that defendant was also shooting and "it possibly could have been two guns[ ] that caused the shooting." Shaw later testified "I ain't never seen [defendant] pull out no gun." Shaw also stated that defendant said to Garrett, "[c]ome on, Bro[,]" shortly before the shooting started. Additionally, in his testimony at defendant's February 27, 2016 preliminary examination, read into evidence at trial, Shaw testified that both Garrett and defendant were shooting at Shaw and Stanley. Shaw later contradicted his earlier testimony, stating that he did not see defendant with a gun, and only saw him "reach[ ]" toward his waist, leading Shaw to believe that defendant had a gun. Shaw confirmed that he saw Garrett pull out a gun and fire.

We acknowledge, as defendant points out in his brief on appeal, that Shaw's testimony throughout the lower court proceedings regarding who fired the shots that hit Stanley and Shaw was indeed inconsistent. However, the fact that Shaw gave inconsistent testimony does not render the evidence insufficient to support defendant's convictions. "The jury is 'free to believe or disbelieve, in whole or in part, any of the evidence presented at trial.'" *People v Unger*, 278 Mich App 210, 228; 749 NW2d 272 (2008), quoting *People v Eisenberg*, 72 Mich App 106, 115; 249 NW2d 313 (1976). Additionally, all inconsistences in the record evidence are to be resolved in favor of the prosecution. *People v Jackson*, 292 Mich App 583, 587-588; 808 NW2d 541 (2011). This Court will not interfere with the jury's determinations concerning (1) the weight to be given to evidence, or (2) matters of credibility. *Lee*, 243 Mich App at 167. With regard to the theory that defendant acted as an aider and abettor, the evidence does not support defendant's contention that he was merely present at the scene of the crimes and did not aid in their commission. Rather, the record evidence demonstrates that defendant acted as a willing and active participant in the shootings of Shaw and Stanley. Defendant first tried to lure Stanley away from the home by suggesting that he join defendant and Garrett for a drink. Further, defendant was standing at Garrett's side as Garrett fired the shots at Shaw and Stanley, and ran away with Garrett after the shooting. Accordingly, we conclude that the record evidence supported defendant's convictions as both a principal and under an aiding and abetting theory.

## III. GREAT WEIGHT OF THE EVIDENCE

Defendant next claims that the verdict was against the great weight of the evidence. We disagree.

Defendant concedes that he did not move for a new trial to preserve his claim that the verdict was against the great weight of the evidence. To preserve a great-weight claim, a defendant must raise it in a motion for a new trial. *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011). Because this issue was not raised before the trial court, it is not preserved for appellate review and we review it for plain error. *Id*. at 618. To demonstrate plain error, a defendant must show "that (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error prejudiced substantial rights, i.e., the error affected the outcome of the lower court proceedings." *Id*.

The threshold for displacing a jury's verdict is high. "When analyzing a great-weight challenge, no court may sit as the 13th juror and reassess the evidence." *People v Bosca*, 310 Mich App 1, 13; 871 NW2d 307 (2015) (citation and quotation marks omitted). Conflicting

testimony or issues of witness credibility generally do not provide grounds for a new trial based on a great-weight claim. *Id.*

"[A]bsent exceptional circumstances," issues of witness credibility are within the exclusive province of the trier of fact. [*People v Lemmon*, 456 Mich 642, 646; 576 NW2d 129 (1998)]. "To support a new trial, the witness testimony must 'contradict[ ] indisputable physical facts or laws,' be 'patently incredible or def[y] physical realities,' be 'so inherently implausible that it could not be believed by a reasonable juror,' or have been 'seriously impeached' in a case that was 'marked by uncertainties and discrepancies.' " [*People v Galloway*, 307 Mich App 151, 167; 858 NW2d 520 (2014), rev'd in part on other grounds 498 Mich 902 (2015).] [*Bosca*, 310 Mich App at 13.]

In his brief on appeal, defendant points to the same evidence that he relied on for his sufficiency of the evidence challenge—mainly, Shaw's inconsistent testimony concerning who fired the gun that shot Stanley and Shaw. Defendant also points out that the parties stipulated at trial that only one gun was fired. None of the record evidence supporting the verdict, however, contradicts indisputable physical facts or laws, defies physical realities, or is inherently implausible. See *id*. As we observed above, the prosecution alleged that defendant was culpable as an aider and abettor or as a principal, and Shaw's testimony, while containing discrepancies, supported either theory. Such inconsistencies, or issues of witness credibility, generally do not warrant a new trial on the basis that the verdict is against the great weight of the evidence. *Bosca*, 310 Mich App at 13. Accordingly, we are not persuaded that plain error occurred.

IV. MOTION FOR MISTRIAL

In his final argument, defendant claims the trial court abused its discretion by denying his motion for mistrial. We disagree.

"This Court reviews for an abuse of discretion the trial court's decision to deny a defendant's motion for a mistrial. The trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014) (footnote and citation omitted). A trial court's decision regarding the admission of evidence is also reviewed for an abuse of discretion. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014).

Defendant's motion for mistrial was predicated on the admission of a videotape showing Shaw being beaten by a group of people immediately after Shaw testified against Garrett at Garrett's preliminary examination. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence is admissible unless it is excluded by the state or federal constitution, or rule of evidence. MRE 402. In particular, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "[E]vidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v*

*Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010) (citation and quotation marks omitted). "The trial court is in the best position to make MRE 403 determinations on the basis of a contemporaneous assessment of the presentation, credibility, and effect of testimony[.]" *People v Mardlin*, 487 Mich 609, 627; 790 NW2d 607 (2010) (citation and quotation marks omitted).

At trial, Shaw testified that he heard a pop, but he never saw anyone pull a firearm and he could not recall any of his previous testimony under oath during the investigative subpoena proceedings or during Garrett or defendant's preliminary examinations. On re-direct examination at trial, the prosecution moved to introduce the videotape to illustrate to the jury why Shaw was reluctant to testify and recanting his prior testimony. The trial court allowed the prosecution to play the videotape for the jury over defendant's objection that any probative value of the evidence was substantially outweighed by unfair prejudice, particularly where the jury could surmise that defendant was in some way involved in the beating of Shaw. When the trial reconvened a few days later, defendant moved for a mistrial on the same grounds.

As an initial matter, we agree with the trial court's assessment that the videotape was relevant to provide additional information to the jury regarding why Shaw, a key prosecution witness, did not want to testify at trial about the crimes and feigned that he could not remember any details of the crimes. See *People v Mills*, 450 Mich 61, 72; 537 NW2d 909, modified on other grounds 450 Mich 1212 (1995) ("If a witness is offering relevant testimony, whether that witness is truthfully and accurately testifying is itself relevant[.]"). Alternatively, defendant also argues that the tape was more prejudicial than probative given that the prosecution allegedly connected the actors in the tape to defendant. Defendant points to the prosecution's question during its direct examination of Shaw, "Now, were you ever threatened about testifying in this case[?]" According to defendant, the prosecution's choice of words in "this case," connects the videotape to defendant. However, the prosecution then went on to question Shaw regarding whether he recalled what happened to him once he testified at Garrett's preliminary examination. When the colloquy between Shaw and the prosecution is read in context, we are not persuaded that a juror would necessarily connect the actors in the videotape to defendant. On this record, we cannot agree that the trial court abused its discretion in admitting the evidence and in denying defendant's motion for a mistrial.[1]

Defendant additionally argues that admission of the videotape denied him a fair trial because it violated his constitutional right to confront the witnesses against him. Defendant did not raise this argument in the trial court and, therefore, this argument is unpreserved. We review unpreserved claims for plain error affecting substantial rights. *Cameron*, 291 Mich App at 618.

Notably, the videotape did not include statements about defendant made during a police interrogation or other formal proceedings, therefore it was nontestimonial in nature and did not "implicate the Confrontation Clause." *People v Taylor*, 482 Mich 368, 377, 378; 759 NW2d 361 (2008). Thus, we conclude that no plain error occurred. Again, the trial court did not abuse its

---

[1] During closing argument, the prosecution also explained to the jury that the videotape was introduced to show why Shaw was unwilling to testify truthfully at trial.

discretion in allowing the admission of the videotape and in denying defendant's motion for mistrial.

Affirmed.

/s/ Christopher M. Murray
/s/ Mark J. Cavanagh
/s/ Karen M. Fort Hood