*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JERRELL LASHON FINCH,

Defendant-Appellant.

UNPUBLISHED
February 11, 2020

No. 344933
Calhoun Circuit Court
LC No. 2017-000214-FC

Before: FORT HOOD, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of second-degree murder, MCL 750.317, and delivery of a controlled substance causing death, MCL 333.7401; 750.317a. The trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to life imprisonment with the possibility of parole for the second-degree murder conviction and to 37½ to 75 years' imprisonment for the delivery conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On January 4, 2017, Michael Newman asked defendant to help him procure some heroin. Defendant brokered a drug transaction and obtained drugs for Newman; the drugs turned out to be fentanyl.[1] After Newman ingested the fentanyl at defendant's house, he lost consciousness. Defendant loaded the unconscious (and barefoot) Newman into his car, drove to a semi-isolated area, and left him on the side of the road, at night, in wintry weather. Defendant testified at trial that Newman was making noises and appeared to be alive when defendant left him there. According to defendant, he returned about two hours later and checked on Newman, who was still in the same spot. He was making noises and appeared to still be alive. Defendant took Newman's

---

[1] At trial, Sergeant Scott Eager of the Battle Creek Police Department testified that fentanyl is a synthetic opioid that can be packaged as heroin. He stated, "Even though scientifically they are two different substances, to the person on the street, to the addict on the street he's not necessarily going to differentiate between the two."

-1-

cellular telephone, left Newman where he was, and disposed of the phone. After another two hours, defendant and a friend, Tonika Graham, drove past Newman, who was still in the roadway. Graham called 911 and reported that there was a man in the roadway who might need medical attention.

When the police arrived, they found Newman deceased and partially covered in snow. At trial, Brandy Shattuck, M.D., an expert witness who had performed an autopsy on Newman, testified that Newman had died of a fentanyl overdose, but that the cold weather could have contributed to his death. She clarified:

> So this person is going to have a very slow, low heart rate and a very low breathing rate before they die [as a result of the fentanyl intoxication]. And given this I can't be certain if the decedent was alive or dead when he was on the side of the road. If he was already dead, then the cold could not have contributed to his death.

> But he may have been breathing very slowly and he may have had a very slow heart rate. . . . And so it's possible he could have still been alive at that time. I'm not aware if he was or not.

> And if he was, on top of having these drugs that are going to slow down his heart rate and his breathing rate, the cold can also slow down heart rate and breathing rate and may have contributed to the death. And since I wasn't there and I don't know what happened I can't rule that in or out.

Defendant presented two expert witnesses of his own, who opined that Newman had died of a fentanyl overdose and that the cold weather did not contribute to his death.

Defendant was convicted and sentenced as described. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to convict him of second-degree murder.[2] We disagree.

We review de novo a challenge to the sufficiency of the evidence. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). To sustain a conviction, due process requires that there be sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). We review the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Bennett*, 290 Mich App 465, 471-472; 802 NW2d 627 (2010). In applying this standard, we "must draw all reasonable inferences and make credibility choices in

---

[2] Defendant does not challenge the sufficiency of the evidence supporting the delivery of a controlled substance causing death conviction.

support of the jury verdict." *People v Cameron*, 291 Mich App 599, 613; 806 NW2d 371 (2011). (quotation marks and citation omitted). Circumstantial evidence and any reasonable inferences flowing from that evidence can prove the elements of a crime. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998) (citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. at 464 (citation omitted). Second-degree murder is a general-intent crime, and the malice element requires only general *mens rea*. *Id*. "[T]he mens rea for second-degree murder does not mandate a finding of specific intent to harm or kill. The intent to do an act in obvious disregard of life-endangering consequences is a malicious intent." *Id*. at 466 (citation omitted). Intent may be established by drawing reasonable inferences from circumstantial evidence. *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014).

Defendant contests whether the evidence was sufficient to establish the second and third elements of the crime, i.e. that he caused Newman's death and did so with malice. We conclude that sufficient evidence supported both elements. The evidence at trial indicated that defendant obtained drugs and delivered them to Newman. After the victim ingested the drugs and lost consciousness, defendant transported Newman and left him on the side of the road, in the January cold, at night, while it was snowing. According to defendant, Newman was still alive when defendant left him on the roadway. And Newman was still alive two hours later when defendant returned; yet rather than aid him, defendant took Newman's cellular phone (a device that, potentially, could have been used to summon aid or used by others to locate Newman) and left him for still another two hours before another person called 911. Dr. Shattuck opined that the fentanyl would have caused the victim's heart rate and breathing to slow, but that if he was still alive when defendant left him in the snow, the exposure to the cold temperatures would have further slowed his heart and breathing rates and could have contributed to his death. Although defendant's expert witnesses disagreed that the cold weather played a factor in Newman's death, matters of credibility and the weight attributed to evidence are matters for the jury to determine. *People v Unger*, 278 Mich App 210, 228-229; 749 NW2d 272 (2008). In this case, the jury appears to have found Dr. Shattuck's testimony more credible and to have given her testimony greater weight. A police officer also testified that during an interview, defendant discussed how he had debated calling for help and taking the victim's cellular telephone because he was worried about getting in trouble. From this evidence, a rational jury could infer that defendant's actions in not only failing to act to help Newman when he lost consciousness, but in leaving him outside in the winter's cold, unconscious and shoeless, resulted in his death. And a rational jury could conclude, especially when defendant knew that Newman had ingested opiates shortly before losing consciousness, and when defendant admitted to having returned to the scene, found Newman still alive, and taken his cellular phone, that defendant had left Newman in the roadway in "obvious disregard of the life-endangering consequences." *Goecke*, 457 Mich at 466.

Viewing the evidence in the light most favorable to the prosecution, *Bennett*, 290 Mich App at 471-472, and in drawing all reasonable inferences and making credibility choices in support of the jury verdict, *Cameron*, 291 Mich App at 613, we conclude that a rational jury could find

-3-

that the elements of second-degree murder were proven beyond a reasonable doubt. There was sufficient evidence to convict defendant of second-degree murder.

## III. ADMISSION OF DEFENDANT'S LETTER

Defendant also argues that the trial court abused its discretion by admitting a hand-written letter from defendant to Newman's family, in which defendant apologized and said that he would never sell drugs or get drugs for anyone else. Defendant argues that the letter was irrelevant and unfairly prejudicial. We disagree.

We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *Unger*, 278 Mich App at 247. A trial court abuses its discretion when it chooses an outcome that is outside of the range of reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." MRE 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. "Of critical importance to this analysis is whether the proffered evidence helps prove a material fact at issue. By definition, if the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial." *People v Martzke*, 251 Mich App 282, 293; 651 NW2d 490 (2002). "All relevant evidence is prejudicial; it is only *unfairly* prejudicial evidence that should be excluded." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005) (citation omitted and emphasis added). Evidence is unfairly prejudicial "when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id*. at 614 (citation omitted). "This unfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Id*. (quotation marks and citations omitted).

In this case, defendant was charged with delivery of a controlled substance causing death. Therefore, a material fact was whether defendant had delivered a controlled substance to Newman. That is, whether defendant delivered a controlled substance was a "fact that [was] of consequence to the determination of the action." MRE 401. The statements in defendant's letter that he was sorry and would never sell drugs or get drugs for anyone again made the existence of the fact that he delivered controlled substances to the victim "more probable . . . than it would be without the evidence." MRE 401. We therefore conclude that the evidence was relevant under MRE 401. The letter had probative value in helping to prove an essential element of one of the charges against defendant. Moreover, there was no reason to believe that the jury would give the letter too much weight, or that the letter injected considerations extraneous to the merits of the charges, such as the jury's bias, sympathy, anger, or shock, *McGhee*, 268 Mich App at 613-614, especially when defendant had admitted to at least brokering a drug transaction between Newman and another drug dealer. Accordingly, we hold that the trial court did not abuse its discretion by admitting defendant's letter into evidence. *Unger*, 278 Mich App at 247.

## IV. ADMISSION OF VIDEO DEPICTING DEFENDANT IN JAIL GARB

Defendant also argues that the trial court abused its discretion by admitting into evidence a videotaped police interview, because in the video defendant was wearing jail clothing. Defendant claims that playing the video for the jury was a violation of his due-process rights as discussed in *Estelle v Williams*, 425 US 501; 96 S Ct 1691; 48 L Ed2d 126 (1976). We disagree.

The United States Constitution and the Michigan Constitution guarantee a defendant's right to due process and a fair trial. US Const, Am VI, XIV; Const 1963, art 1, § 20; see also *People v Conley*, 270 Mich App 301, 307; 715 NW2d 377 (2006). As part of that due process right, a defendant cannot be compelled to stand trial in front of a jury while wearing jail clothing. *Estelle*, 425 US at 512.

Defendant solely relies on *Estelle* to support his argument. However, *Estelle* is inapplicable. In *Estelle*, the defendant wore jail clothing *at trial*. Moreover, he had specifically asked for civilian clothing before standing trial before a jury. *Id*. at 502. That request was denied. *Id*. In this case, it is undisputed that defendant did not appear at trial dressed in jail clothing. He was only wearing jail clothing in the video interview, and there was no indication that he asked for civilian clothing before the interview. Moreover, in *Estelle*, the United States Supreme Court discussed the reason for the prohibition against jail clothing at trial, noting that such attire was a "*constant* reminder of the accused's condition implicit in such distinctive, identifiable attire [that] may affect a juror's judgment." *Id*. at 504-505 (emphasis added). That is, jail clothing at trial could be a "continuing influence" on the jury throughout the trial. *Id*. at 505. Defendant was only wearing jail clothing in one piece of video evidence. He otherwise appeared in civilian clothing throughout the trial. We conclude that the video showing defendant in jail clothing was not a "constant reminder" or a "continuing influence" that could have affected the jury's judgment.

We are not persuaded by defendant's reliance on *Estelle*, and conclude that the trial court did not abuse its discretion by admitting the videotaped interview. *Unger*, 278 Mich App at 247. We note further that the trial court instructed the jury that the fact that defendant was arrested and was in custody was not evidence. Jurors are presumed to follow their instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and a curative instruction is generally sufficient to cure most errors, *People v Horn*, 279 Mich App 31, 36; 755 NW2d 212 (2008).

## V. OFFENSE VARIABLES

Defendant further argues that the trial court erred by assessing points for offense variables (OVs) 3, 8, and 19. We disagree.

"Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *Id*. A finding of fact is clearly erroneous if we are left with a definite and firm conviction that the trial court made a mistake. *People v Armstrong*, 305 Mich App 230, 242; 851 NW2d 856 (2014). A preponderance of the evidence means that the evidence "when weighed with that opposed to it, has more convincing

force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008).

Defendant argues that the trial court erred by assessing 25 points for OV 3. MCL 777.33 concerns physical injury to a victim. The statute directs the trial court to assess 25 points if "[l]ife threatening or permanent incapacitating injury occurred to a victim." MCL 777.33(1)(c). Defendant argues that the evidence showed that Newman ingested the drugs that led to his death, and that defendant's conduct therefore did not cause a life-threatening injury to Newman. We find defendant's argument to be without merit.

A life-threatening injury is one that is "in the normal course, potentially fatal." *People v Chaney*, 327 Mich App 586, 590; 935 NW2d 66 (2019). Contrary to defendant's argument, OV 3 "does not assess whether a *defendant's actions* were life-threatening; rather, OV 3 assesses whether a *victim's injuries* were life-threatening." *People v Rosa*, 322 Mich App 726, 746; 913 NW2d 392 (2018). Here, Dr. Shattuck testified that both fentanyl toxicity and exposure to cold temperatures could cause a decrease in respiration and heart rate; she further testified that Newman's fentanyl toxicity itself was sufficient to cause death, and that the cold weather to which Newman was exposed could have caused his death in "minutes to hours." Dr. Shattuck testified that her autopsy showed that Newman had "heavy lungs" caused by him not breathing at the appropriate rate. Whether caused by the drugs delivered by defendant, the cold, or a combination, it is clear that Newman suffered a life-threatening injury in the form of a decreased heart rate and respiration rate before he died, and the trial court did not err by assessing defendant 25 points for OV 3.[3]

Defendant also argues that the trial court erred by assessing 15 points for OV 8. We disagree. MCL 777.38 concerns victim asportation, and directs the trial court to assess 15 points if "[a] victim was asported to another place of greater danger or to a situation of greater danger . . . ." MCL 777.38(1)(a). Asportation can occur without the use of force against the victim, and it can occur even when the victim voluntarily accompanies the defendant to a place or a situation that presents a greater danger. *People v Dillard*, 303 Mich App 372, 379; 845 NW2d 518 (2013). A place of greater danger includes an isolated location where criminal activities might avoid detection. *Id*. The record shows that defendant took Newman from an indoor location to an isolated outdoor area where he was exposed to the cold, wintry weather as well as the risk of being struck by vehicles on the road. The trial court did not err by assessing 15 points for OV 8.

Finally, defendant argues that the trial court erred by assessing 10 points for OV 19. MCL 777.49 concerns interference with the administration of justice, and directs the trial court to assess 10 points if "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice . . . ." MCL 777.49(1)(c). In assessing points under OV 19, a court may consider the defendant's conduct after the completion of the sentencing offense. *People v Smith*,

---

[3] When the sentencing offense is a homicide, a trial court is prohibited from scoring 50 or 100 points; conversely, a trial court is prohibited from scoring zero points when a bodily injury in fact occurred, notwithstanding that the victim died and the defendant was charged with a homicide. See *People v Houston*, 473 Mich 399, 405-406; 702 NW2d 530 (2005).

488 Mich 193, 200; 793 NW2d 666 (2010). "[T]he plain and ordinary meaning of 'interfere with the administration of justice' for purposes of OV 19 is to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013).

In *Hershey* we discussed examples of interfering with the administration of justice:

Decisions of both this Court and our Supreme Court have held the following conduct to constitute an interference or attempted interference with the administration of justice: providing a false name to the police, threatening or intimidating a victim or witness, telling a victim or witness not to disclose the defendant's conduct, fleeing from police contrary to an order to freeze, *attempting to deceive the police during an investigation*, interfering with the efforts of store personnel to prevent a thief from leaving the premises without paying for store property, and committing perjury in a court proceeding. [*Id*. at 343-344 (emphasis added).]

In this case, the record shows that defendant was interviewed multiple times by different police officers. He initially denied any contact with Newman, instead claiming that he was visiting various friends on the night that Newman died. He later changed his story to say that he did have contact with the Newman, and in fact had brokered the drug deal, but he stated that he told Newman to leave after he had obtained the drugs for him. He also stated that he merely found Newman sleeping in the car as opposed to actually carrying him out to the car himself. Defendant eventually provided the true story to police officers, which led to his arrest. Also, the evidence indicated that defendant returned to the scene and took the victim's cellular telephone in order to hinder any investigation that might lead to him. This evidence was sufficient for the trial court to find that defendant attempted to deceive police officers during an investigation by providing them with false and varying stories and by taking and discarding the Newman's cellular telephone in order to avoid detection. The trial court properly assessed 10 points for OV 19. *Id*.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

-7-